[Civ. No. 4821. Fifth Dist. Aug. 31, 1981.]

CYNTHIA BALDWIN, Plaintiff and Appellant, v.
STEVEN ZORADI et al., Defendants and Respondents.

■

■

COUNSEL

Myers & D'Angelo and John M. Maller for Plaintiff and Appellant.

McKay & Byrne, McKay, Byrne & Udkovich, John P. McKay, Michael A. Byrne and Linda Fermoyle Rice for Defendants and Respondents.

OPINION

**ANDREEN, Acting P. J.**—On February 12, 1977, plaintiff was injured as a result of a collision. Her third amended complaint, consisting of thirteen causes of action, contains five causes of action against defendants Trustees of the California State University and Colleges (Trustees), the governing body and administrative agency of California State University and Colleges, and Jeanne Baumgartner and Steven Zoradi (Baumgartner and Zoradi), dormitory advisors. The university involved is California Polytechnic State University, San Luis Obispo (Cal Poly). A general demurrer was sustained to those five causes of action. She declined to further amend and appeals from the ensuing judgment of dismissal.

■ On appeal after a sustained demurrer, the court must assume the truth of the factual allegations of the complaint. (*Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 517 [150 Cal.Rptr. 1, 585 P.2d 851]; *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 815 [164 Cal.Rptr. 264].) ■ The function of a demurrer is to test the legal sufficiency of the challenged pleading by raising questions of law. (*Whitcombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 702 [141 Cal.Rptr. 189].)

THE ALLEGATIONS OF THE COMPLAINT

*The Fourth Cause of Action*

The plaintiff alleges: She was a passenger in one of three cars driven by Cal Poly student defendants, whose identities are not material here, that other student defendants aided and abetted the negligent drivers, that all of them are under 21 years of age (some under 18 years of age), and that as a proximate result of negligent activity (engaging in a speed contest) the car in which she was riding collided with one or both of the other cars, causing it to leave the highway and overturn. She emerged from the accident a quadriplegic.

The Trustees were the governing body of Cal Poly and Baumgartner and Zoradi were their employees with duties as student dormitory "advisors and/or monitors."

Students lived in the dorms pursuant to an agreement termed a "license," which is set out in the appendix. The students thereby had a "special relationship" with the Trustees. Plaintiff, a student living in the dorms pursuant to the "license," had a right to and did rely upon the enforcement of provisions in the license agreement governing student conduct while on campus. The possession and/or consumption of alcoholic beverages is proscribed on the campus, including the dorms, by the terms of the license agreement and by statute.

On the day in question, and on many prior occasions, the Trustees and the dormitory advisors "knowingly permitted" the student defendants and other students to possess and consume alcoholic beverages in the residence halls in contravention of the license, regulations and laws and failed to take appropriate steps to control the student defendants. That on the date in question, the student defendants consumed "great amounts" of alcoholic beverages to the point of intoxication. That as a foreseeable result of said activity, the student defendants operated their vehicles while under the influence of intoxicants proximately injuring plaintiff. The Trustees and dormitory advisors were negligent in several particulars, including a failure to perform a mandatory duty to enforce the provisions of the license agreement, and by so doing "caused to be furnished" alcoholic beverages to persons under the age of 21 years and

aided the student defendants to consume alcohol on campus negligently and in contravention of law which was enacted for the protection of the public from injuries and that a duty of care existed because of the land-lord-tenant relationship.

### The Fifth Cause of Action

The allegations of the fourth cause of action are incorporated; there are additional allegations that in the school catalog and announcements it is stated that rules of student conduct prohibit use and consumption of alcoholic beverages, and disciplinary action will be taken for violation thereof, and that the dormitory advisors were under a mandatory duty to enforce the rules of student conduct, but negligently failed to perform said duty which was a proximate cause of plaintiff's injuries.

### The Sixth Cause of Action

The Trustees and dormitory advisors permitted a dangerous condition to exist at the residence hall in that consumption of alcohol by minors occurred regularly, and the said defendants knew or should have known of such occurrence and taken appropriate steps to stop the activity. By "knowingly acquiescing in the consumption of alcohol by minors on campus over an extended period of time, the Trustees, and their employees, created an unsafe condition, to wit, a safe haven or enclave where large groups of minors could, would and did gather and consume alcoholic beverages, to an excess, with complete impunity from any laws or rules and regulations."

### The Seventh Cause of Action

The Trustees breached the license agreement in that they permitted a chronic pattern of disobedience to their rules forbidding alcoholic consumption thereby rendering the premises dangerous. And, having actual or constructive knowledge of said condition, intentionally and negligently failed to reduce the hazard or to warn students of the dangers. Plaintiff was proximately injured thereby.

### The Thirteenth Cause of Action

In the petition for rehearing the plaintiff informs us that she dismisses this cause of action.

Discussion

*Negligence as Alleged in the Fourth
and Fifth Causes of Action*

The allegations aver nonfeasance rather than misfeasance. (See *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36].) Liability can attach only if a special relationship existed between the Trustees on the one hand, and the plaintiff and student defendants on the other. (*Mann* v. *State of California* (1977) 70 Cal.App.3d 773, 778-779 [139 Cal.Rptr. 82]; *Buford* v. *State of California, supra,* 104 Cal.App.3d 811, 819-820.) We will examine whether the relationship of school and student or the school regulations impose such a special relationship.

*Negligence in Reference to Primary
and Secondary Education*

Schools and their personnel owe a duty to students who are on school grounds to supervise them and to enforce rules and regulations necessary for their protection. Either a total lack of supervision or ineffective supervision may constitute a lack of ordinary care. It is the task of supervisors to anticipate and curb behavior of students who have not attained full maturity. (*Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 747-748 [87 Cal.Rptr. 376, 470 P.2d 360].)

The duty to supervise can exist off the school grounds by virtue of a duty to supervise students while on the campus. (*Hoyem* v. *Manhattan Beach City Sch. Dist., supra,* 22 Cal.3d 508, 515.) In *Hoyem,* a case which involved a dismissal at the demurrer stage, the allegations were that the 10-year-old student was negligently supervised and as a proximate cause of such negligence left the school premises without permission and was injured when hit by a motorcycle at a public intersection. The court held that although a school district is not an insurer of students' safety, it has a legal duty to exercise reasonable care in supervising students while on the school premises and may be held liable for injuries proximately caused by the failure to so supervise. Whether such duty existed and whether negligent on-campus supervision was the proximate cause of an off-campus injury were held to be questions of fact for the jury.

*Hoyem* relied on *Dailey* v. *Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d 741 which reversed a motion for directed verdict in a case where two high school students were playing "slap boxing," during which one of the combatants fell, fracturing his skull, resulting in death. The *Dailey* court stressed that school authorities have a duty to supervise the conduct of children on school grounds, using ordinary care in doing so. "High school students may appear to be generally less hyperactive and more capable of self-control than grammar school children. Consequently, less rigorous and intrusive methods of supervision may be required. Nevertheless, adolescent high school students are not adults and should not be expected to exhibit that degree of discretion, judgment, and concern for the safety of themselves and others which we associate with full maturity." (*Dailey* v. *Los Angeles Unified Sch. Dist., supra,* 2 Cal.3d at p. 748.)

The pleadings under review are virtually identical with those in *Hoyem* and *Dailey*. In both cases, as well as the one before us, the complaint alleged that school personnel failed to exercise ordinary care in supervising a student while the student was on school premises, which proximately caused a student's resulting injury.

The ages and educational level of the students in those two cases varied considerably from those in the instant case. In *Hoyem*, the student was a 10-year-old boy. In *Dailey*, the student was 16 years old. The cases relied on in *Hoyem* involved a youth of 17 years (*Satariano* v. *Sleight* (1942) 54 Cal.App.2d 278 [129 P.2d 35]); a 15 year old (*Calandri* v. *Ione Unified School Dist.* (1963) 219 Cal.App.2d 542 [33 Cal.Rptr. 333]); and children 7 1/2, 8 and 10 1/2 years (*Bryant* v. *United States* (10th Cir. 1977) 565 F.2d 650).

In the instant case, none of the student defendants involved had attained the age of 21 years. Some of the student defendants were under the age of 18 years.[1]

*Other Special Relationship Cases*

When the avoidance of foreseeable harm requires a defendant to control the conduct of another person, or to warn of such conduct,

---

[1]Plaintiff's age at the time of the accident on February 12, 1977, is not established in the record. However, her first complaint, filed nine months after the accident, was filed in her own capacity as an adult.

the common law as a general rule imposes liability only if the defendant bears some special relationship to the dangerous person or potential victim. (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 435 [131 Cal.Rptr. 14, 551 P.2d 234, 83 A.L.R.3d 1166].)

California cases have been quick to recognize a duty of reasonable care when the defendant stood in a special relationship to both the victim and the person whose conduct created the danger. As summarized in *Tarasoff* v. *Regents of University of California, supra*, 17 Cal.3d 425, 436, footnote 9, they are: "*Ellis* v. *D'Angelo* (1953) 116 Cal. App.2d 310 . . ., upheld a cause of action against parents who failed to warn a babysitter of the violent proclivities of their child; *Johnson v. State of California* (1968) 69 Cal.2d 782 . . ., upheld a suit against the state for failure to warn foster parents of the dangerous tendencies of their ward; *Morgan* v. *County of Yuba* (1964) 230 Cal.App.2d 938 . . ., sustained a cause of action against a sheriff who had promised to warn decedent before releasing a dangerous prisoner, but failed to do so."

And in *Tarasoff*, a therapist was told by his patient that he intended to kill Tatiana Tarasoff. The therapist and his supervisors predicted that the patient presented a serious danger of violence. In fact he did, for he carried out his threat. The court held that the patient-therapist relationship was enough to create a duty to exercise reasonable care to protect others from the foreseeable result of the patient's illness. The *single* relationship of a doctor to his patient was enough to require the exercise of reasonable care to protect a foreseeable victim. Accordingly, a judgment following the sustaining of a demurrer in favor of defendant therapist without leave to amend was reversed.

We must confront the difficult question of whether the relationship between the Trustees, on the one hand, and the students and plaintiff, on the other, creates a "special relationship" imposing a duty of due care to prevent injuries under the facts of this case.[2]

A relationship of dependence may create such a "special relationship." (*Mann* v. *State of California, supra*, 70 Cal.App.3d 773, 779-780; *Buford* v. *State of California, supra*, 104 Cal.App.3d 811,

---

[2]*Tarasoff* reaffirmed the common law rule that one person owes no duty to control another absent a special relationship. (See fn. 5, p. 435.) See also the discussion and holding that the demurrer of the police defendants was properly sustained without leave to amend at page 444.

821.) In *Mann*, a state traffic officer stopped to assist some stranded motorists on the freeway. He parked behind them with his rearward flashing light protecting them. After securing a tow car, he left, leaving them exposed. It was held that once he had undertaken to investigate their plight and informed himself of the foreseeable danger from passing traffic, a special relationship resulted, and he had to exercise ordinary care to protect them from the risk. (*Mann, supra*, 70 Cal. App.3d at pp. 779-780.) In *Buford*, a special relationship was found between one Daniels and the state by virtue of the fact that Daniels was an inmate in Atascadero State Hospital which required it to warn foreseeable victims about his release. (*Buford, supra*, 104 Cal.App.3d at p. 824.)

Another case involving a special relationship is *Clemente v. State of California* (1980) 101 Cal.App.3d 374 [161 Cal.Rptr. 799]. There a traffic officer stopped to investigate an accident whereby the plaintiff was injured while in a crosswalk when hit by a motorcycle. The officer radioed for assistance, but then left without obtaining the motorcyclist's identity. The motorcyclist left the scene. The plaintiff was disabled by the accident and dependent upon the officer, whose failure prevented plaintiff from suing the motorcyclist for damages. Because of the relationship between the investigating officer and the helpless plaintiff, the officer had a duty to exercise reasonable care in his investigation of the accident. (*Id.*, at pp. 379-380.)

Plaintiff has attempted to bring herself within the above cases by alleging that a special relationship existed between the Trustees and the dormitory advisors on the one hand, and herself and the students on the other, by virtue of the license agreement (see appen.) under which she and the student defendants occupied their dormitory rooms. The important provisions of the license in respect to this case may be summarized:

The university retained the right to terminate the room license of any student on not less than one-day's notice and further reserved the right to change room assignments in the "interest of health, discipline, or the general welfare of the residents." The license further provided that no refund would be made to an occupant forced to vacate his/her room by reason of disciplinary action.

The university, while recognizing its obligation to respect the right of occupants of the residence halls to be free from unreasonable searches and seizures and intrusion into their living quarters, nonetheless retained a "reasonable right of inspection by appropriate University personnel," noting it was "necessary to the University's performance of its duties with respect to management, health, safety [and] maintenance of applicable rules and regulations, ..."

The license prohibited alcoholic beverages in the residence halls and forbade consumption of alcohol on the campus. Furthermore, no one was permitted to enter a residence hall or be on campus at any time while under the influence of alcohol.

Visiting hours in rooms of members of the opposite sex were limited to certain hours and students were further instructed ("shall") to comply with all orders, directives, rules and policies of the university.

We have difficulty in finding that the license agreement created the type of dependent relationship which was found in the traffic officer cases (*Mann, supra*, 70 Cal.App.3d 773, *Clemente, supra*, 101 Cal. App.3d 374 and *Green* v. *City of Livermore* (1981) 117 Cal.App.3d 82 [172 Cal.Rptr. 461], mod. 117 Cal.App.3d 870i[3]) or in the dangerously mentally ill cases (*Tarasoff, supra*, 17 Cal.3d 425, and *Buford, supra*, 104 Cal.App.3d 811) which would impose a duty to control alcoholic intake by students. In each, unlike the case at bar, an imminent danger (or potential for loss) to others was apparent.

Central to any decision regarding whether a defendant owes a "duty" to exercise reasonable care is the concept of foreseeability. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Coulter* v. *Superior Court* (1978) 21 Cal.3d 144, 152 [145 Cal.Rptr. 534, 577 P.2d 669].)

It is alleged in the complaint that the negligent failure to prevent on-campus drinking on the date in question made it reasonably foreseeable

---

[3]In *Green*, the court held that it was a question of fact whether the action of police officers leaving car keys in a vehicle occupied by two drunken passengers created a dangerous condition of public property. It also held that there was a question of fact whether under the circumstances it was reasonable to expect the officers to take some steps to take the keys, thus immobilizing the car.

that the students would follow the drinking by the driving of their cars in a negligent manner with plaintiff's resultant injuries.[4]

Foreseeability is stated to be a question of fact for the jury (*Weirum v. RKO General, Inc., supra*, 15 Cal.3d 40, 46), but the matter does not end there. "'... *reasonable* foreseeability does not turn on whether the particular [defendant] as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected....'" (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 922 [167 Cal.Rptr. 831, 616 P.2d 813], quoting from *Dillon v. Legg* (1968) 68 Cal.2d 728, 741 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], italics added.) Even though a harm may be foreseeable, as it is alleged to be here, a concomitant duty to prevent the harm does not always follow. "Rather, the question is whether the risk of harm is sufficiently high and the amount of activity needed to protect against harm sufficiently low to bring the duty into existence, ..." (*Bartell v. Palos Verdes Peninsula Sch. Dist.* (1978) 83 Cal.App. 3d 492, 499 [147 Cal.Rptr. 898].)

The Supreme Court has identified certain factors in determining the ultimate existence of a "duty" to third persons. These factors include: "... the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Rowland v. Christian, supra*, 69 Cal.2d at p. 113.)

Application of the *Rowland* elements to the circumstances herein alleged does not support a rule establishing a duty of care and imposition of liability. Plaintiff's injuries are alleged to be most substantial, and we have no difficulty finding a "certainty" in relation thereto. But there is

---

[4]If foreseeability were established, a trier of fact could find that the intervening negligent conduct of the student drivers was reasonably foreseeable. It would not in that event be a superseding cause, but merely the immediate cause of plaintiff's injuries. (See 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 628, p. 2910; Rest.2d Torts, §§ 447, 449, pp. 478, 482.)

a lack of a close connection between the failure of the Trustees and dormitory advisors to control on-campus drinking and the speed contest.

Nor may these defendants be "morally blamed" for their omission. *Bradshaw* v. *Rawlings* (3d Cir. 1979) 612 F.2d 135 is persuasive authority for this position. In *Bradshaw* the 18-year-old plaintiff was injured while returning from a sophomore class picnic which was held off campus. The driver of his vehicle became intoxicated at the picnic. The class advisor had cosigned a check for the beer. Flyers announcing the picnic were prominently displayed on campus; they featured a drawing of beer mugs. After a substantial verdict against the defendant college, the appellate court reversed, deciding as a policy question that the college should not be held obligated (should not have a "duty") to control such a drinking party. The court observed that the authoritarian role of college administrators is gone. Students have demanded rights which have given them a new status and abrogated the role of *in loco parentis* of college administrators. "[¶] Our beginning point is a recognition that the modern American college is not an insurer of the safety of its students. Whatever may have been its responsibility in an earlier era, the authoritarian role of today's college administrations has been notably diluted in recent decades. Trustees, administrators, and faculties have been required to yield to the expanding rights and privileges of their students." (*Bradshaw* v. *Rawlings, supra*, 612 F.2d at p. 138.)

The court further noted that college administrators no longer control the general area of general morals. Students have insisted upon expanded rights of privacy, including liberal, if not unlimited, partial visiting hours. The students had attained majority, with all rights accorded to them save the right to consume alcoholic beverages. As stated in *Bradshaw* at pages 139-140: "[¶] There was a time when college administrators and faculties assumed a role *in loco parentis*. . . . A special relationship was created between college and student that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the college. . . . A dramatic reapportionment of responsibilities and social interests of general security [has taken] place. . . . College administrators no longer control the broad arena of general morals. At one time, exercising their rights and duties *in loco parentis*, colleges were able to impose strict regulations. But today students vigorously claim the right to define and regulate their own lives."

Although it is alleged that some of the student defendants were under the age of 18 years, it may be assumed that the majority of students at Cal Poly have attained majority. Since the turbulent '60's, California colleges and universities have been in the forefront of extension of student rights with a concomitant withering of faculty and administrative omnipotence. Drug use has proliferated. Although the consumption of alcoholic beverages by persons under 21 years of age is proscribed by law (Bus. & Prof. Code, § 25658), the use of alcohol by college students is not so unusual or heinous by contemporary standards as to require special efforts by college administrators to stamp it out. Although the university reserved to itself the right to take disciplinary action for drinking on campus, this merely follows state law. (Bus. & Prof. Code, § 25608.) The same may be said of the provisions of the license agreement prohibiting alcoholic beverages. We do not believe they created a mandatory duty. As stated in *Bradshaw* v. *Rawlings, supra*, 612 F.2d at page 141: "[Plaintiff] has concentrated on the school regulation imposing sanctions on the use of alcohol by students. ... We are not impressed that this regulation, in and of itself, is sufficient to place the college in a custodial relationship with its students for purposes of imposing a duty of protection in this case.... A college regulation that essentially tracks a state law and prohibits conduct that to students under twenty-one is already prohibited by state law does not, in our view, indicate that the college voluntarily assumed a custodial relationship with its students so as to [impose a duty of protection.]"

*Peterson* v. *City of Long Beach* (1979) 24 Cal.3d 238 [155 Cal.Rptr. 360, 594 P.2d 477], relied on by appellant, is distinguishable. There a police officer violated city regulations. In the instant case, it was the students, not the Trustees, who committed the violation.

In reference to the policy of preventing future harm, the Legislature, as noted above, has consistently expressed a policy against consumption of alcoholic beverages by persons under 21 years of age and collegiate drinking. Thus, Business and Professions Code section 25658 provides: "[¶] (a) Every person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage to any person under the age of 21 years is guilty of a misdemeanor.

"(b) Any person under the age of 21 years who purchases any alcoholic beverage, or any person under the age of 21 years who consumes

any alcoholic beverage in any on-sale premises, is guilty of a misdemeanor and shall be punished by a fine of not less than one hundred dollars ($100), no part of which shall be suspended.

"(c) Any on-sale licensee who knowingly permits a person under the age of 21 years to consume any alcoholic beverage in the on-sale premises, whether or not the licensee has knowledge that the person is under the age of 21 years, is guilty of a misdemeanor."

A person under 21 years of age does not have unlimited access to bars. (Bus. & Prof. Code, §§ 25663, 25665.) And possession, consumption, sale, gift or delivery of alcoholic beverages on school grounds is prohibited. (Bus. & Prof. Code, § 25608.) A state college is a part of the public school system. (Cal. Const., art. IX, § 6.)

Sales of alcoholic beverages within a certain distance from campus of certain colleges and universities is proscribed. (See Pen. Code, §§ 172-172.9.)

Finally, an unaccompanied person under the age of 21 years may not drive a motor vehicle carrying any alcoholic beverage. (Veh. Code, § 23123.5.)

However, there is an obvious distinction between "giving" (Bus. & Prof. Code, § 25608) or "furnishing" (Bus. & Prof. Code, § 25658) alcoholic beverages and the failure to stop a drinking party or parties. Business and Professions Code section 25608, prohibiting consumption of alcoholic beverages on school grounds, imposes upon the university no duty to enforce the laws.

This is recognized in *Coulter* v. *Superior Court, supra*, 21 Cal.3d 144 which extended *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151] to noncommercial providers such as social hosts. Liability was predicated on Business and Professions Code section 25602, which provides that the furnishing of any alcoholic beverage to an obviously intoxicated person is a misdemeanor. Because of the language of the code, the court found no distinction between commercial vendors and social hosts. Imposition of civil liability was also predicated upon general negligence principles. The service of alcoholic beverages to an

obviously intoxicated person when the provider knows such person intends to drive a motor vehicle creates a reasonably foreseeable risk of injury to those on the highway.

However, *Coulter* refused to impose liability on the owner of the apartment complex and its manager for "permitting" alcoholic beverages to be served on the premises to the negligent driver and who "'aided, abetted, participated [in] and encouraged' [the driver] to drink in excess." Since these allegations did not assert that these defendants actually furnished liquor to the driver, no liability was imposed. "Furnish" within the meaning of Business and Professions Code section 25658, implies some affirmative action. The court cited with approval *Wiener* v. *Gamma Phi Chap. of Alpha Tau Omega Frat.* (1971) 258 Ore. 632 [485 P.2d 18, 22, 53 A.L.R.3d 1276], which denied liability for merely providing a room where alcoholic beverages were to be served to minor university students. (*Coulter, supra*, 21 Cal.3d at p. 155.)

Plaintiff was injured before the 1978 Legislature amended the Business and Professions Code and the Civil Code (Bus. & Prof. Code, § 25602, subds. (b) and (c); Civ. Code, § 1714, subds. (b) and (c)) to immunize providers of alcoholic beverages from civil liability for injuries attributable to intoxication. But we see no preexisting policy imposing civil liability for the nonfeasance alleged against the defendants Trustees and/or dormitory advisors.

In reference to the policy of preventing future harm, we do not have here a case where university administrators collaborated with others to encourage students to imbibe with knowledge of their intention to thereupon operate a motor vehicle. The policy of preventing future harm, which the Supreme Court found so strong in *Coulter, supra*, 21 Cal.3d 144, is not as strong in the instant case because of the lack of direct involvement with the furnishing of alcoholic beverages.

In respect to the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, it would be difficult to so police a modern university campus as to eradicate alcoholic ingestion. As stated in *Bradshaw* v. *Rawlings, supra*, 612 F.2d at page 138: "Certainly, the plaintiff in this case possessed an important interest in remaining free from bodily injury, and thus the law protects his right to recover compensation from those who

negligently cause him injury. The college, on the other hand, has an interest in the nature of its relationship with its adult students, as well as an interest in avoiding responsibilities that it is incapable of performing."

Nor is it in the best interests of society to do so. The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest.

We have nothing before us indicating the availability, cost and prevalence of insurance for the risk involved. But we assume Trustees, probably self-insured for exposure up to a certain amount, experience no difficulty in securing excess coverage for large risks at relatively modest rates.

We conclude that application of the *Rowland* elements do not support a rule establishing a duty of care under the facts of the instant case.[5]

### Dangerous Condition—Sixth Cause of Action

Appellant argues that the "condition" of the dormitory premises (no supervision) invited the students to drink alcoholic beverages. She alleges the premises constituted a dangerous condition in the nature of an invitation to the students to drink alcohol.

Relying on *Bartell v. Palos Verdes Peninsula Sch. Dist., supra*, 83 Cal.App.3d 492 and Government Code section 835,[6] defendants argue

---

[5]Although we are not persuaded that respondents are protected by governmental immunity (Gov. Code, § 810 et seq.), our holding makes it unnecessary to examine the point in detail.

[6]Government Code section 835 states: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

that there is no authority for the proposition that alcoholic beverages in a dormitory room constitute a risk of harm and a dangerous condition, and that a "physical defect" in the property is required in order to state a cause of action against a public entity.

In *Bartell, supra*, the trial court dismissed plaintiffs' complaint for failure to state a cause of action and the Court of Appeal affirmed. Plaintiffs' 12-year-old son was killed after school hours on a school playground that was enclosed by a fence but apparently accessible through an unlocked gate or a hole in the fence. The child sustained fatal injuries while playing a skateboard game similar to crack the whip. Plaintiffs alleged that the defective condition of the fence or unlocked gate, viewed in conjunction with allegations of the known use of the school yard for the dangerous skateboard game, constituted a "dangerous condition" necessary for recovery under Government Code section 835. The appellate court disposed of this contention as follows: "To constitute a dangerous condition under Government Code section 835, public property must possess a physical defect which creates a substantial, as distinguished from a minor, trivial or insignificant, risk of injury. (Gov. Code, § 830, subd. (a).) Harmful conduct in and of itself cannot form a basis for recovery without a direct causal connection with the physical defect. As stated by the Supreme Court in *Hayes* v. *State of California* (1974) 11 Cal.3d 469, 472 ...: 'Liability for injury caused by a dangerous condition of property has been imposed when an unreasonable risk of harm is created by a *combination* of defect in the property and acts of third parties.... However, courts have consistently refused to characterize harmful third party conduct as a dangerous condition—absent some concurrent contributing defect in the property itself.'" (*Bartell, supra*, 83 Cal.App.3d at p. 497, italics original.)

The *Hayes* opinion cited in the above quotation, after examining the definition of a "dangerous condition" as defined in Government Code section 830,[7] points out that in all cases where liability for injury caused by a dangerous condition of property has been imposed on a govern-

---

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

[7]Government Code section 830 provides, in pertinent part: "As used in this chapter: [¶] (a) 'Dangerous condition' means a condition of property that creates a substantial ... risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used."

mental entity, some physical feature of the property has been at least a *contributing* defect, if not *the* defect. (*Hayes* v. *State of California* (1974) 11 Cal.3d 469, 472 [113 Cal.Rptr. 599, 521 P.2d 855]; see also *Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707 [159 Cal.Rptr. 835, 602 P.2d 755].)

Plaintiff, however, points to *Stockwell* v. *Board of Trustees* (1944) 64 Cal.App.2d 197 [148 P.2d 405] in which the Court of Appeal reversed an order of dismissal entered pursuant to a nonsuit. In *Stockwell*, plaintiff was injured on the Stanford campus when hit in the eye by a shot from a BB gun. Evidence showed that those charged with responsibility for the safe condition of the university grounds were aware of "promiscuous use" of small rifles and BB guns for as long as two years prior to plaintiff's injury.

The court held it was a question of fact if use by a third party of a BB gun on campus created a dangerous condition: "The general rule is that 'An owner in occupation of the premises violates his duty to an invitee when he negligently allows conditions to exist on the property which imperil the safety of persons upon the premises. For such violation he is responsible in damages to the injured person . . .' (38 Am.Jur. p. 756.) In other words, as said in 19 Cal.Jur. page[s] 618-9: 'Not only must an owner of land or a proprietor of premises abstain from willfully injuring an invitee, but he owes such person the duty of maintaining his property in a safe condition, and of exercising reasonable care in protecting the invitee from injury through his negligence. . . . The question whether reasonable care has been used in the maintenance of premises is for the jury. . . .'" (*Id.*, at pp. 199-200.)

No "physical defect" was present on the property in *Stockwell*. However, it should be noted that the *Stockwell* language was couched in terms of duty which arose because of notice of prior conduct (shooting pellet guns in a dangerous way) that might result in injury. To the same effect, see *Rosales* v. *Stewart* (1980) 113 Cal.App.3d 130 [169 Cal.Rptr. 660]—a landlord may be liable for a tenant's activity in firing guns from his property if the landlord could eliminate the dangerous condition by termination of the tenancy. (See also Rest.2d Torts, § 318.) And see *Uccello* v. *Laudenslayer* (1975) 44 Cal.App.3d 504 [118 Cal.Rptr. 741, 81 A.L.R.3d 628], which reversed a judgment of nonsuit in favor of a landowner for an invitee's injuries inflicted by a tenant's vicious dog which was known as such by the landlord. In the instant case, as in *Uccello* and *Rosales*, the landlord had the right to

terminate the tenants'/students' occupancy on short notice. However, the conduct of students, without known violent propensities and without knowledge that they would drink to excess and thereafter operate motor vehicles, does not rise to the level of foreseeable harm as does a case where the tenant has a known vicious dog or where he uses rented property as a firing range. *Uccello, Rosales* and *Stockwell* are distinguishable on their facts.

While it is "reasonably foreseeable" that college students might drink in dormitory rooms, in order for the dorm to create a dangerous condition for which defendants could be liable pursuant to Government Code section 830, the condition must create a substantial risk of injury when it is used with due care in a manner which is reasonably foreseeable. The idea of students congregating in a room and drinking to excess "with due care" is incongruous in light of the apparent meaning of the statute.[8]

No cause of action for negligent creation of a dangerous condition was stated.

### Hazardous Condition Created by Breach of Contract—Seventh Cause of Action

■ Plaintiff's seventh cause of action alleges that the Trustees breached the license agreement by permitting a "chronic pattern of disobedience to their rules including rules forbidding the consumption of alcohol on campus, thereby rendering said premises hazardous and dangerous," and further alleged the Trustees failed to take adequate precautions to reduce the hazard despite knowledge of its existence.

These allegations are an attempt to bring the case within *Duarte* v. *State of California*,* (Cal.App.). Since the case was ordered depublished, it may not be relied upon. The breach of the license agreement by one student imposes no contractual duty upon the Trustees in regard to another student.

[8]The Supreme Court has declined to rule whether only the plaintiff need exercise due care. (*Ducey* v. *Argo Sales Co., supra*, 25 Cal.3d 707, 719, fn. 5.)

*Reporter's Note: Deleted on direction of Supreme Court by order dated March 14, 1979.

## CONCLUSION

This action is on the cutting edge of the tort law. Cases such as *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d 425; *Green* v. *City of Livermore, supra,* 117 Cal.App.3d 82, modified 117 Cal.App.3d 870i; *Rosales* v. *Stewart, supra,* 113 Cal.App.3d 130; *Buford* v. *State of California, supra,* 104 Cal.App.3d 811; *Mann* v. *State of California, supra,* 70 Cal.App.3d 773; *Uccello* v. *Laudenslayer, supra,* 44 Cal.App.3d 504 and *Quelvog* v. *City of Long Beach* (1970) 6 Cal.App.3d 584 [86 Cal.Rptr. 127] have expanded the concept of duty. But imposition of liability here would extend it one step further. We believe that the public policy considerations discussed herein indicate that the step should not be taken.

The judgment is affirmed.

Evans (C. P.), J.,* and Thompson, J.,† concurred.

A petition for a rehearing was denied September 30, 1981, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied November 13, 1981.

---

*Assigned by the Chairperson of the Judicial Council.

†Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.