Agnes, Peter W., J.
INTRODUCTION
Plaintiff, Daniel Ms. Bash (“Plaintiff’), brought this wrongful death action against Clark University (“Clark") and nine individuals for the death of his daughter, Michele Claudia Bash (“Ms. Bash”). Ms. Bash died on campus after using heroin while she was a freshman at Clark in Worcester, Massachusetts. Defendant Matthew Book (“Book”) was a freshman at the time of Bash’s death and allegedly supplied Ms. Bash with heroin. The other eight individual defendants, administrators at Clark at the time of Ms. Bash’s death, are alleged to have been negligent in taking preventative steps necessary to protect Ms. Bash and for misrepresenting to Plaintiff that Ms. Bash would be provided with a safe and healthy environment while at Clark.
The Clark administrators have moved collectively, pursuant to Mass.R.Civ.P. 12(b)(6), for dismissal of the misrepresentation claim (Count IV) against them on the ground that the claim is based only on vague, generalized statements. Separately, defendants John Bassett (“Bassett”), then President of Clark; Erin Ellison (“Ellison”), then Bash’s academic probation advi-sor; Julianne Ohotnicky (“Ohotnicky”), then Clark’s *85 Associate Dean of Students; and Jason Zelesky (“Zelesky”), then Clark’s Assistant Dean of Students/Wellness Outreach Coordinator; have further moved pursuant to R. 12(b)(6) for dismissal of all claims against them asserting that no special relationship existed between them individually, and Ms. Bash.
Also, defendants Clark; Kristin Conti (“Conti”), then the area coordinator for Bash’s residence, Johnson Hall; Denise Darrigrand (“Darrigrand”), then the acting Dean of Students at Clark; Amy Gauthier (“Gauth-ier”), then Clark’s Director of Residential Life; and Stephen Goulet (“Goulet”), then Chief of Campus Police at Clark, have moved for leave to file a third-party complaint against Daniel Ms. Bash and Emily Bash, the decedent’s parents, seeking indemnity and/or contribution asserting that Ms. Bash’s parents had a special relationship with their daughter and through their knowledge/omissions, they proximately caused their daughter’s death. For the reasons stated below the Motions to Dismiss are ALLOWED and the Motion for Leave to File a Third-Party Complaint is ALLOWED.[3]
BACKGROUND
The following are facts as alleged in the plaintiffs complaint which are assumed to be true for purposes of deciding the motions to dismiss.
Ms. Bash enrolled as a freshman at Clark in August of 2003. She was an on-campus resident in Johnson Hall until her death on March 2, 2004. During the academic year that Ms. Bash attended Clark, the university required all its students to live in on-campus housing for their first four semesters. During orientation, Clark distributed to parents and students a handbook which states, inter alia, the “(s]taff in the Dean of Students Office manages the nonacademic services that [they] provide to ensure the health and safety of the individuals who are living and learning at Clark University.”
Clark had a policy of not allowing students under 21 years of age to possess or consume alcohol on school property. Clark also had a policy of not tolerating the distribution, possession, sale of use of any illegal drugs. While Ms. Bash attended Clark, the City of Worcester was known to have a problem with illegal narcotics and was identified as one of the three areas of eastern Massachusetts with the greatest heroin overdose problem. Clark reported over 20 on-campus drug-related violations in each of the three years preceding Ms. Bash’s death.
During Ms. Bash’s first semester at Clark, she encountered some difficulties in her academic and personal life. For instance, on September 23, 2003, the campus police were called to talk to Ms. Bash after she became intoxicated and vomited in a dormitory bathroom. Also in September and October, Ms. Bash’s residential advisors made several notations in logs/reports that indicated concern over Ms. Bash’s suspected use of alcohol.
In the fall of 2003, Ms. Bash’s parents found evidence in Ms. Bash’s on-line journal that indicated Ms. Bash had possibly used illegal drugs while at Clark. Ms. Bash’s father contacted Clark’s Counseling Center to report his daughter’s possible drug use and his concern. On December 8, 2003, Darrigrand met with Ms. Bash after hearing her name in connection with drug use on campus. Ms. Bash denied using drugs at this time.
In January of2004, Ms. Bash was put on academic probation due to her poor grades from the previous semester. Ellison was assigned as Bash’s Academic Probation Advisor and met with Ms. Bash on at least three occasions. Following these meetings, Ellison noted that Ms. Bash did not look well, was not sleeping, and was homesick. Ellison also recommended that Ms. Bash go to the Counseling Center and Clark’s Health Center. Ellison’s concerns were not shared with Ms. Bash’s parents and no further action to assist her or monitor her health was taken.
Darrigrand, along with Ohotnicky, met with Ms. Bash again on Februaiy 5, 2004 in response to additional information Darrigrand had received about drug use on campus. Ms. Bash admitted to Darrigrand that contrary to what she had told her at their previous meeting in December, she had tried heroin once in the fall, but it had made her sick, she had not used it since, and was not taking any other illegal drugs. Darringrand informed her mother of this meeting and assured her that “she was going to get rid of heroin on the Clark campus.”
In a report for the week of March 1, 2004, Bash’s residential advisor stated that Ms. Bash ignored him, looked mad and/or upset and might be drinking a bit much. On the evening of March 1, 2004, Matthew Book obtained and provided Ms. Bash with heroin purchased on campus. Ms. Bash and Book then wandered the campus and broke into a campus building to watch television. On or about the morning of March 2, 2004, Ms. Bash and Book returned to Ms. Bash’s dormitory room and went to sleep. When Book allegedly awoke around 12:00 p.m., Ms. Bash was not responding and Book called 911. Worcester Emergency Medical Technicians subsequently performed CPR on Ms. Bash in her room and then transported her to St. Vincent’s Hospital, where she was pronounced dead at 12:55 p.m. on March 2, 2004.
DISCUSSION
I. Standard of Review
The standard of review for a motion to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) is well settled. The court takes as true “the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiffs favor . . .” Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995); Eyal v. *86 Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). In evaluating the allowance of a motion to dismiss, we are guided by the principle that a complaint is sufficient “unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998).
Also, an allegation of fraud must be pled with particularity pursuant to Mass.R.Civ.P. 9(b) in order to enable the defendants to be warned adequately of the particular actions that constitute the alleged fraud or misrepresentation so that they may prepare their defense. Friedman v. Jablonski, 371 Mass. 482, 488 (1976).
II. Negligence
“Negligence, without qualification and in its ordinary sense, is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duly then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances.” Carroll v. Bouley, 338 Mass. 625, 627 (1959). In any negligence case, a plaintiff must prove: (1) a legal duly owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury. See e.g. Jorgensen v. Massachusetts Port Authority, 905 F.2d 515, 522 (1st Cir. 1990) (applying Massachusetts law); see also W. Prosser & W. Keeton, The Law of Torts, §30 (5th ed. 1985). Ordinarily “we do not owe others a duty to take action to rescue or protect them from conditions we have not created.” Cremins v. Clancy, 415 Mass. 289, 296 (1993).
A. Special Relationship Exception
Section 314A of the Restatement (Second) of Torts expressly recognizes that there exist “special relationships” which give rise to a duty to act or protect a person where otherwise no duty would exist:
This Section states exceptions to the general rule, stated in §314 that the fact that the actor realizes or should realize that this action is necessary for the aid and protection of another does not in itself impose upon him any duty to act. The duties stated in this Section (common carrier, innkeeper, land owner, one who is required by law or voluntarily takes custody of another) arise out of special relationships between the parties, which create a special responsibility, and take the case out of the general rule. The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found.
Id. at Comment B.
The Supreme Judicial Court explained the basis for imposing a duty where a “special relationship” exists in Irwin v. Town of Ware, 392 Mass. 745 (1984). It stated that special relationships are “based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.” Irwin v. Town of Ware, 392 Mass. 745, 756 (1984).
However, Massachusetts has not adopted the principle of section 321 of the Restatement under which an actor is liable to another simply as a result of doing an act that he or she “realizes or should realize” creates “an unreasonable risk of causing physical harm” to another. Panagakos v. Walsh, 434 Mass. 353, 356 (2001). Thus, the foreseeability of physical harm is not the linchpin for determining the existence of a common-law duty under Massachusetts tort law. Instead, the question of duty is determined by a consideration of “existing social values, customs, and considerations of policy.” Luoni v. Berube, 431 Mass. 729, 730 (2000), quoting Cremins v. Clancy, 415 Mass. 289, 292 (1993), and cases cited. As the Court noted in Yakubowicz v. Paramount Pictures Corp., 404 Mass. 624, 629 (1989), “there can be negligence only where there is a duty to be careful, and whether there is a duty to be careful is a question of law. In determining whether the law ought to provide that a duty of care is owed by one person to another, we look to existing social values and customs, and to appropriate social policy.” (Citations omitted.) After carefully reviewing the circumstances involved in this case and the challenges faced by university officials and staff in attempting to eradicate drug use on college campuses, recognizing a special relationship in this instance would impose on university officials and staff an unreasonable burden that would be at odds with contemporary social values and customs. See Kavanagh v. Trustees of Boston University, 440 Mass. 195, 201 (2003) (“[A]s a general rule, there is no duty to protect another from the criminal conduct of a third party”).
B. Determining the Existence of a Special Relationship
The appellate courts of Massachusetts have yet to decide whether a special relationship exists between a university or its officials on the one hand and its students on the other, which would impose a duty to protect students from the voluntary use of drugs and alcohol. However, courts in other jurisdictions have dealt with this question, and this court adopts the reasoning found in a majority of those cases in concluding that Clark owes no duty in this case.
First, courts in other jurisdictions have balanced the foreseeability of harm with what steps would be necessary to protect students. This court finds this balancing approach to be the most appropriate way to resolve the issue at hand. “The question is whether the risk of harm is sufficiently high and the amount of activity needed to protect against harm sufficiently low *87 to bring the duty into existence ...” Baldwin v. Zoradi, 123 Cal.App.3d 275, 286 (1981). The evidence before the court, viewed in the light most favorable to the plaintiffs, does not support the conclusion that the tragic death of Michele Claudia Bash from a heroin overdose was reasonably foreseeable to the defendants. The complaint states that Ms. Bash admitted to tiying heroin once, several months before her death. It also states that it made her sick and she had not done any illegal drugs since. See Complaint ¶42. Furthermore, nowhere in the complaint does it state that Ms. Bash was suicidal or made any reference to wanting to end her life. This court believes that although there is ample evidence to suggest that Ms. Bash was homesick, or looked mad and upset without additional facts, the risk of death or serious injury resulting from a drug overdose was not so plainly foreseeable that a special relationship existed between the student and the university. In addition, as discussed below, this court has grave reservations about the capacity of any university to undertake measures to guard against the risk of a death or serious injury due to the voluntary consumption of drugs other than those provided by or with the approval of the university. The doctrine of in loco parentis has no application to the relationship between a modern university and its students. See Bradshaw v. Rawlings, 612 F.2d 135, 139 (3d Cir. 1979), cert. den. sub nom., Doylestown v. Bradshaw, 446 U.S. 909 (1980). See Peter F. Lake, “The Special relationship(s) Between a College and a Student: Law and Policy Ramifications for the Post In Loco Parentis College,” 37 Idaho L.Rev. 531, 535 (2001). Most college students have attained the age of majority by the time they enroll as freshman and are responsible for their own conduct. There are fundamental and obvious distinctions between children at the elementary, middle and secondary levels, on the one hand, and students in colleges and universities on the other hand, and the corresponding responsibility of those who are in charge of their care and education. This distinction was highlighted in Baldwin v. Zoradi, 123 Cal.App.3d 275 (1981), where the California Court stated, “college administrators no longer control the general area of general morals. Students have insisted upon expanded rights of privacy, including liberal, if not unlimited, [parietal] visiting hours. The students had attained majority, with all the rights accorded to them save the right to consume alcoholic beverages.” Baldwin v. Zoradi, 123 Cal.App.3d 275 (1981), citing Bradshaw v. Rawlings, 612 F.2d 135 (3rd Cir. 1979). Here, Ms. Bash made a decision in a private place to ingest heroin despite being aware of the risks and consequences, and after her parents warned her she would be taken out of school if she did it again.
Second, it is not appropriate to ground the existence of a legal duty on the part of university officials and staff on the basis of unrealistic expectations about their ability to protect their students from the dangers associated with the voluntary use of illegal drugs. In Mullins v. Pine Manor College, 389 Mass. 47 (1983), the Supreme Judicial Court distinguished between the responsibility of a college or university to safeguard its female students from physical harm resulting from criminals who intrude into unlocked or inadequately locked dormitories, on the one hand, and the responsibility of students and parents to take responsibility for the moral well-being of the students. The burden of protecting against the risks associated with the illegal use of drugs is far more like the burden associated with maintaining the moral well-being of students than it is like the burden of protecting the physical integrity of dormitories. Mullins v. Pine Manor, supra, 389 Mass. at 52. Contrast Schieszler v. Ferrum College, 236 F.Sup.2d 602, 609 (W.D.Va. 2002) (recognizing a special relationship in circumstances in which the university was aware that the decedent had emotional problems, that he was found alone in his dormitory room with bruises on its head that he described as self-inflicted, and that around the same time he told his girlfriend that he intended suicide; based on these facts the university simply obtained written assurances from the decedent that he would not harm; the decedent’s subsequent suicide was certainly foreseeable). It is not possible for the most vigilant university to police all drug use and protect every student from the tragic consequences of voluntary drug use. In Crow v. State of California, the court held imposing a duty of care on a university to protect its students from the risks of harm flowing from the use of alcoholic beverages would be “unwarranted and impracticable.” Crow v. State of California, 222 Cal.App.3d 192, 209 (1990). To impose liability on the part of university officials and staff in this case would be tantamount to imposing on them the duty of an insurer against the type of tragedy that happened to Ms. Bash. The inherent nature of drugs is that they are small, easily transportable, easily obtainable, and can be easily concealed. As such, this court is not of the view that the tragic consequences of the voluntary use of drugs by Ms. Bash was reasonably foreseeable. As the defendants have pointed out, a university cannot prevent these incidents from occurring “except possibly by posting guards in each dorm room on a 24-hour, 365-day per year basis.” Id. at 209. This is not the type of burden that one may expect a party or a social institution such as a university to assume as the basis of a special relationship.
Third, recognition of the existence of a legal duty on the part of university officials and staff in this case would conflict with the expanded right of privacy that society has come to regard as the norm in connection with the activities of college students. The incursion upon a student’s privacy and freedom that would be necessary to enable a university to monitor students during virtually every moment of their day and night to guard against the risks of harm from the voluntary ingestion of drugs is unacceptable and would not be tolerated.
*88 The cases that have found a special relationship exists between a college and a student thus giving rise to a legal duty on the part of university officials and staff are distinguishable. See, e.g., Mullins v. Pine Manor College, 389 Mass. 47 (1983) (plaintiff was abducted from her dorm room and raped and the SJC held that the college and an administrator owed a duty to exercise care to protect the well being of their resident students, including seeking to protect them against the criminal acts of third parties); Shin v. Massachusetts Institute of Technology, 19 Mass. L. Rptr. 570; 2005 Mass.Super. LEXIS 333 (Middlesex Super.Ct.) (McEvoy, J.) (finding a special relationship existed because MIT administrators were part of Shin’s “treatment team” who met regularly to discuss Shin’s ongoing problems, personally observed Shin’s self-inflicted wounds, referred her to mental health professionals, and received numerous reports regarding Shin’s self-destructive behavior and safety; therefore it was reasonably foreseeable that Shin was going to attempt to kill herself again); Schieszler v. Ferrum College, 236 F.Sup.2d 602 (W.D.Va. 2002) (finding that a trier of fact could conclude that there was “an imminent probability” that the decedent would try to hurt himself, and defendants had notice of this specific harm).
Unlike Mullins, the complaint here does not allege that the individual defendants failed to protect Ms. Bash from third-party criminal acts because there were not any third parties she needed protection from. Rather, Ms. Bash voluntarily ingested heroin and tragically died as a result of the choice that she made. In Shin, Shin had attempted to kill herself in the past and the school administrators were on notice of the fact that she was in imminent danger of killing herself again. With Bash, nothing in the record before this court indicates that there was an “imminent probability” that she was going to ingest heroin again and tragically die as a result. In fact, nothing in the complaint suggests Ms. Bash was suicidal or had a desire to hurt herself or end her life. Also, other than Darrigrand and Ohotnicky, the complaint does not allege that any of these administrators knew Ms. Bash had ever tried heroin. The level of involvement the Clark administrators had with Ms. Bash was significantly different from the involvement of the MIT administrators with Shin.
III. Misrepresentation
There are two types of misrepresentation claims that are recognized in Massachusetts: intentional and negligent. Although Plaintiff has not specified under which theory of misrepresentation he is trying to recover under, the defendants contend Plaintiffs misrepresentation claim must fail regardless. This court agrees.
To recover for intentional misrepresentation, Plaintiff must show that the defendants: (1) made a false representation of material fact; (2) with knowledge of its falsity; (3) to induce Plaintiff to act thereon; and (4) that Plaintiff relied on such representation as true and acted upon it to his detriment. Barrett Assoc., Inc. v. Aronson, 346 Mass. 150, 152 (1963). Furthermore, pursuant to Mass.R.Civ.P. 9(b), a claim for fraudulent misrepresentation must be pled with particularity. An averment of fraud may be considered pled with particularity pursuant to Rule 9(b) if it is alleged who made the statements, to whom the statements were made, the statements were false, the defendant’s knowledge of their falsity, the period which they were made, that they were made to induce the plaintiffs’ reliance, and that the plaintiffs relied to their detriment. Friedman v. Jablonski, 371 Mass. 482, 488 (1976).
The defendants are liable for negligent misrepresentation if, in the course of their business, they: (1) supplied false information for the guidance of Plaintiff in their business transactions; (2) which caused and resulted in pecuniary loss to Plaintiff by his justifiable reliance on the information; and (3) defendants failed to exercise reasonable care or competence in obtaining or communicating the information. Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 587 (1996), quoting Restatement (Second) of Torts §552(1) (1977).
If Plaintiff s misrepresentation claim is based on a theory of fraudulent misrepresentation, it fails because it has not been properly pled. While the complaint may recite to statements that ended up being false, it does not state that the defendants knew them to be false, made them to induce the Plaintiff to send Ms. Bash to Clark, or that Plaintiff relied upon the statements when he made the decision to send Ms. Bash to Clark.
If Plaintiffs claim is based on a theory of negligent misrepresentation, it must also fail because generalized statements in promotional materials or brochures are too vague and indefinite to give rise to a cause of action. In Morris v. Brandeis University, a student was found to have plagiarized his final paper and he challenged the university’s decision. The Appeals Court found the basis for a valid contract based on the detailed procedural standards of the student judicial process contained in the university student handbook. 60 Mass.App.Ct. 1119 (2004) (unpublished opinion). The Court noted, however, that “generalized representations” to treat its students with “fairness and beneficence” in Brandeis’s promotional materials were too vague and indefinite to form an enforceable contract. Id. at n.6.
Also, Darrigrand’s statement to Ms. Bash’s mother that “she was going to get rid of heroin on the Clark campus” is also not strong enough to maintain a claim for negligent representation. Such a statement, by itself, would not lead reasonable people to send their children exclusively to Clark and therefore this court does not consider this statement a specific promise in which Plaintiff would be justified in relying upon.
*89 IV. Third-Party Complaint
Defendants have filed a motion for leave to file a third-party complaint against Plaintiff and his wife pursuant to MassR.Civ.P. 14(a). Mass.R.Civ.P. 14 largely tracks Federal Rule 14. See, Mass.R.Civ.P. 14 Reporter’s Notes. Joinder of third-party defendant is discretionary with the trial judge when the motion is made more than 20 days after the filing of the answer. The first factor to be considered by the judge is whether prejudice will result. If there is no possibility of prejudice either to the parties or to the court resulting from the delay, the motion should be granted. Meilinger v. Metropolitan Edison Co., 34 FRD 143 (DC Pa 1963).
This court concludes that there is no prejudice in allowing the third-party complaint. The third-party plaintiffs filed the complaint only one day after the 20-day deadline. The third-party defendants claim there is prejudice because Ms. Bash’s death has been traumatic for her mother and the third-party complaint will “make her a party against her wishes.” While one cannot help but sympathize with the Ms. Bash family for the terrible loss they suffered, the fact that someone wishes not to be sued is a baseless argument for proving prejudice. Therefore, this court allows the Motion for Leave to File a Third-Party Complaint, however, in light of the disposition with respect to Defendants’ Motions to Dismiss, this ruling may have no practical significance.
ORDER
For the foregoing reasons, it is ORDERED that all of the defendants’ Motions to Dismiss are ALLOWED and Defendants’ Motion for Leave to File a Third-Party Complaint is ALLOWED.

A1so before the court are Defendants’ Motions for Leave to File a Reply Brief in Support of their Motions to Dismiss. Attached to these motions for leave to file are the proposed reply briefs. As the procedure used to file these motions was not in contravention of Superior Court Rule 9A, the court allows these two motions and will consider the arguments presented therein in reaching its decision.