**UNIVERSITY OF DENVER, a Colorado corporation, Petitioner,**

v.

**Oscar WHITLOCK, Respondent.**

**No. 85SC391.**

Supreme Court of Colorado, En Banc.

Oct. 5, 1987.

Rehearing Denied Nov. 2, 1987.

---

Hall & Evans, Alan Epstein, Eugene O. Daniels, James A. Smith, Denver, for petitioner.

Gerash, Robinson, Miller & Miranda, P.C., Walter L. Gerash, Scott H. Robinson, Denver, for respondent.

Kripke, Epstein & Lawrence, P.C., Kenneth N. Kripke, Scott W. Lawrence, Denver, for amicus curiae Colorado Trial Lawyers Ass'n.

Covington & Burling, Eugene D. Gulland, Marjorie E. Powell, Sheldon E. Steinbach, Washington, D.C., for amici curiae American Council on Educ. and the Nat. Ass'n of Student Personnel Administrators.

LOHR, Justice.

Plaintiff Oscar Whitlock obtained a judgment against defendant University of Denver in the amount of $5,256,000, as a result of a jury trial in Denver District Court, for injuries suffered in a trampoline accident that rendered him a quadriplegic. The trial court ordered certain relief from this judgment based upon the University's motion for judgment notwithstanding the verdict. Whitlock appealed, and the University cross-appealed. The Colorado Court of Appeals rejected the University's argument that it owed no duty to Whitlock, reversed the trial court's order granting relief from the judgment, and directed that the jury's verdict be reinstated. *Whitlock v. University of Denver*, 712 P.2d 1072 (Colo.App. 1985). The University then petitioned for certiorari, and we granted that petition.

The principal issue presented by this negligence case is whether the University of Denver owed a duty of care to Whitlock, who was a student at the University and a member of a fraternity, to take reasonable measures to protect him against injury resulting from his use of a trampoline under unsafe conditions when the trampoline was owned by the fraternity and was located on the front lawn of the house that the fraternity leased from the University. We conclude that the University had no such duty. Therefore, we reverse the judgment of the Colorado Court of Appeals, which recognized such a duty, and return the case to that court with directions to remand it to the trial court for dismissal of Whitlock's complaint against the University of Denver.[1]

I.

The essential facts appear from the record of the jury trial in this case. On June 19, 1978, at approximately 10:00 p.m., plaintiff Oscar Whitlock suffered a paralyzing injury while attempting to complete a one-and-three-quarters front flip on a trampoline. The injury rendered him a quadriplegic. The trampoline was owned by the Beta Theta Pi fraternity (the Beta house) and was situated on the front yard of the fraternity premises, located on the University campus. At the time of his injury, Whitlock was twenty years old, attended the University of Denver, and was a member of the Beta house, where he held the office of acting house manager. The property on which the Beta house was located was leased to the local chapter house asso-

[1.] We also accepted certiorari to determine whether the court of appeals erred in reversing the judgment of the trial court and reinstating the jury's apportionment of negligence, and to review the court of appeals' affirmance of the trial court's rulings admitting certain documen-

tary and opinion evidence. Our determination that reversal is required because the University had no duty to Whitlock concerning use of the trampoline makes it unnecessary to address these additional issues.

ciation of the Beta Theta Pi fraternity by the defendant University of Denver.

Whitlock had extensive experience jumping on trampolines. He began using trampolines in junior high school and continued to do so during his brief tenure as a cadet at the United States Military Academy at West Point, where he learned to execute the one-and-three-quarters front flip. Whitlock testified that he utilized the trampoline at West Point every other day for a period of two months. He began jumping on the trampoline owned by the Beta house in September of 1977. Whitlock recounted that in the fall and spring prior to the date of his injury, he jumped on the trampoline almost daily. He testified further that prior to the date of his injury, he had successfully executed the one-and-three-quarters front flip between seventy-five and one hundred times.

During the evening of June 18 and early morning of June 19, 1978, Whitlock attended a party at the Beta house, where he drank beer, vodka and scotch until 2:00 a.m. Whitlock then retired and did not awaken until 2:00 p.m. on June 19. He testified that he jumped on the trampoline between 2:00 p.m. and 4:00 p.m., and again at 7:00 p.m. At 10:00 p.m., the time of the injury, there again was a party in progress at the Beta house, and Whitlock was using the trampoline with only the illumination from the windows of the fraternity house, the outside light above the front door of the house, and two street lights in the area. As Whitlock attempted to perform the one-and-three-quarters front flip, he landed on the back of his head, causing his neck to break.

Whitlock brought suit against the manufacturer and seller of the trampoline, the University, the Beta Theta Pi fraternity and its local chapter, and certain individuals in their capacities as representatives of the Beta Theta Pi organizations. Whitlock reached settlements with all of the named defendants except the University, so only the negligence action against the University proceeded to trial. The jury returned a verdict in favor of Whitlock, assessing his total damages at $7,300,000. The jury at-tributed twenty-eight percent of causal negligence to the conduct of Whitlock and seventy-two percent of causal negligence to the conduct of the University. The trial court accordingly reduced the amount of the award against the University to $5,256,-000.

The University moved for judgment notwithstanding the verdict, or, in the alternative, a new trial. The trial court granted the motion for judgment notwithstanding the verdict, holding that as a matter of law, no reasonable jury could have found that the University was more negligent than Whitlock, and that the jury's monetary award was the result of sympathy, passion or prejudice. The trial court alternatively ruled that if the court of appeals should find that the trial court's ruling on the defendant's motion for judgment notwithstanding the verdict was in error, a remittitur would be entered, reducing the jury's award to $4,000,000. As a third alternative, in the event that the court of appeals should also disapprove the remittitur, the trial court ordered a new trial.

A panel of the court of appeals reversed all three rulings by a divided vote. *Whitlock v. University of Denver*, 712 P.2d 1072 (Colo.App.1985). The court of appeals held that the University owed Whitlock a duty of due care to remove the trampoline from the fraternity premises or to supervise its use, and that it was improper for the trial court to order a remittitur or, in the alternative, a new trial. The case was remanded to the trial court with orders to reinstate the verdict and damages as determined by the jury. The University then petitioned for certiorari review, and we granted that petition.

II.

 A negligence claim must fail if based on circumstances for which the law imposes no duty of care upon the defendant for the benefit of the plaintiff. *E.g., Jefferson County School District R-1 v. Justus*, 725 P.2d 767, 769 (Colo.1986); *Leake v. Cain*, 720 P.2d 152, 155 (Colo. 1986); *Franklin v. Wilson*, 161 Colo. 334, 336, 422 P.2d 51, 51 (1966); *Roessler v.*

*O'Brien,* 119 Colo. 222, 227–29, 201 P.2d 901, 903–04 (1949). Therefore, if Whitlock's judgment against the University is to be upheld, it must first be determined that the University owed a duty of care to take reasonable measures to protect him against the injury that he sustained.

Whether a particular defendant owes a legal duty to a particular plaintiff is a question of law. *Imperial Distribution Services, Inc. v. Forrest,* 741 P.2d 1251, 1253–54 (Colo.1987); *Smith v. City & County of Denver,* 726 P.2d 1125, 1127 (Colo.1986); *Metropolitan Gas Repair Service, Inc. v. Kulik,* 621 P.2d 313, 317 (Colo. 1980). "The court determines, as a matter of law, the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." *Metropolitan,* 621 P.2d at 317. *Accord Palmer v. A.H. Robins Co., Inc.,* 684 P.2d 187, 209 (Colo.1984). *See Restatement (Second) of Torts* § 328 B (1965); W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 37, at 236 (5th ed. 1984) (cited hereafter as W. Keeton). In *Smith v. City & County of Denver,* 726 P.2d 1125 (Colo.1986), we set forth several factors to be considered in determining the existence of duty in a particular case:

> Whether the law should impose a duty requires consideration of many factors including, for example, the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor.

*Id.* at 1127. *See Jefferson County School District R–1 v. Justus,* 725 P.2d at 769. As the quoted language makes clear, this list was not intended to be exhaustive and does not exclude the consideration of other factors that may become relevant based upon the competing individual, public and social interests implicated in the facts of each case. *See Bradshaw v. Rawlings,* 612 F.2d 135, 138 (3d Cir.1979); W. Keeton, §§ 31, 53 at 359 n. 24.[2] A court's conclusion that a duty does or does not exist is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." W. Keeton, § 53, at 358. *Accord Bradshaw v. Rawlings,* 612 F.2d at 138. "No one factor is controlling, and the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell v. Lannon,* 744 P.2d 43, 46 (Colo.1987). *See* W. Keeton, § 53, at 359.

We believe that the fact that the University is charged with negligent failure to act rather than negligent affirmative action is a critical factor that strongly militates against imposition of a duty on the University under the facts of this case. In determining whether a defendant owes a duty to a particular plaintiff, the law has long recognized a distinction between action and a failure to act—"that is to say, between active misconduct working positive injury to others [misfeasance] and passive inaction or a failure to take steps to protect them from harm [nonfeasance]." W. Keeton, § 56, at 373. Liability for nonfeasance was slow to receive recognition in the law. "The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit him by interfering in his affairs." *Id.* The *Restatement (Second) of Torts* § 314 (1965) summarizes the law on this point as follows:

**2.** W. Keeton points out that changing social conditions lead to the recognition of new duties and the erosion of others. Various factors that have been given conscious or unconscious weight by the courts in determining whether a duty exists include convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, the moral blame attached to the wrongdoer, and availability, cost, and prevalence of insurance for the risk involved. W. Keeton, § 53, at 359 & n. 24; *see also Rowland v. Christian,* 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 100, 443 P.2d 561, 564 (1968).

The fact that an actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.

Imposition of a duty in all such cases would simply not meet the test of fairness under contemporary standards.

In nonfeasance cases the existence of a duty has been recognized only during the last century in situations involving a limited group of special relationships between parties. Such special relationships are predicated on "some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act." W. Keeton, § 56, at 374. 3 F. Harper, F. James, & O. Gray, *The Law of Torts* § 18.6, at 722–25 (2d ed. 1986) (cited hereafter as 3 Harper and James). Special relationships that have been recognized by various courts for the purpose of imposition of a duty of care include common carrier/passenger, innkeeper/guest, possessor of land/invited entrant, employer/employee, parent/child, and hospital/patient. *See Restatement (Second) of Torts* § 314 A (1965); 3 Harper and James, § 18.6, at 722–23. The authors of the *Restatement (Second) of Torts* § 314 A, comment b (1965), state that "[t]he law appears ... to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence."[3] *See Leake v. Cain*, 720 P.2d at 160–61; *Baldwin v. Zoradi*, 123 Cal. App.3d 275, 282–84, 176 Cal.Rptr. 809, 813–14 (1981); *Beach v. University of Utah*, 726 P.2d 413, 415–16 (Utah 1986).

In *Leake v. Cain*, we considered whether police officers and the municipality for which they worked had a duty to protect others from injury resulting from the operation of an automobile by an intoxicated driver. The officers had been dispatched to break up a party after a neighbor complained. Ralph Crowe, one of the teenagers at the party, had been drinking. He became disruptive and was handcuffed and detained by the officers. Crowe's younger brother requested that he be allowed to take responsibility for driving Crowe home. The officers agreed after determining that the brother appeared sober and was licensed to drive. Before arriving home, Crowe took over the operation of the automobile and drove it into a group of persons on the street, killing two of them. The issue presented for this court's review was whether the officers had any duty to the persons killed by Crowe.

In considering the question of the officers' duty, we cited the *Restatement (Second) of Torts* § 315 (1965) for the proposition that "there is no duty to prevent a third person from harming another, absent a special relation between the actor and the wrongdoer or between the actor and the victim." 720 P.2d at 160. We noted that the officers did not release Crowe knowing

---

**3.** Special relationships are not the only situations that give rise to a duty to take affirmative action for another's aid or protection. The *Restatement (Second) of Torts* § 314, comment a (1965), mentions others:

The actor may have control of a third person, or of land or chattels, and be under a duty to exercise such control, as stated in §§ 316–320. The actor's prior conduct, whether tortious or innocent, may have created a situation of peril to the other, as a result of which the actor is under a duty to act to prevent harm, as stated in §§ 321 and 322. The actor may have committed himself to the performance of an undertaking, gratuitously or under contract, and so may have assumed a duty of reasonable care for the protection of the other, or even a third person, as stated in §§ 323, 324, and 324 A.

(Section symbols all refer to *Restatement (Second) of Torts* (1965)). None of these other bases for recognition of such a duty is implicated by the facts of the present case. It has been suggested that recognition of a duty in nonfeasance cases should no longer be confined to special relationships or the other special situations described in the *Restatement (Second) of Torts* § 314, comment a (1965), but should extend to all circumstances involving injury "by defendant's inexcusable failure to act in circumstances wherein action would be effective, easy, and commanded by every social and moral consideration." 3 Harper and James, § 18.6, at 724–25. We need not consider here whether such an extension would be recognized in Colorado, for, as discussed herein, the major social consideration of promoting student autonomy militates against recognition of a duty of the University with respect to students' private recreational activities.

that he would thereafter operate an automobile but instead permitted his younger brother, who appeared sober, to drive Crowe home with the assurance of both young men that the younger brother would drive. We concluded that the officers had no duty of care toward the injured parties, stating "[t]he officers did not assume a duty to [the persons killed in the accident], induce reliance, or create a peril or change the nature of an already existing risk." 720 P.2d at 161. *See also Gammill v. United States,* 727 F.2d 950, 954 (10th Cir. 1984) (applying Colorado law, physician has no duty to warn others with whom he has no special relationship of risk of contagion from hepatitis affecting patient, at least in absence of awareness of specific risks to specific persons); *Brady v. Hopper,* 570 F.Supp. 1333, 1338–39 (D.Colo.1983) (applying Colorado law, psychiatrist had no duty to plaintiffs, to whom risks of injury were not foreseeable, and who had no special relationship with psychiatrist, to protect them against assault by patient), *aff'd,* 751 F.2d 329 (10th Cir.1984); *Jefferson County School District R–1 v. Justus,* 725 P.2d at 769–70 (elementary school's common law custodial duty of care toward students to protect them against negligent acts of third parties is applicable only while students are in the school's charge unless school voluntarily undertakes more extensive duty).

### III.

The present case involves the alleged negligent failure to act, rather than negligent action.[4] The plaintiff does not complain of any affirmative action taken by the University, but asserts instead that the University owed to Whitlock the duty to assure that the fraternity's trampoline was used only under supervised conditions comparable to those in a gymnasium class, or in the alternative to cause the trampoline to be removed from the front lawn of the Beta house. It is true that there is evidence in the record from which the jury could have found that the University possessed the authority to regulate the fraternity's use of the trampoline by enacting rules of student conduct. However, mere possession of such authority is not sufficient to establish that the University had the duty to exert such control with respect to the use of trampolines by fraternity members. If such a duty is to be recognized, it must be grounded on a special relationship between the University and Whitlock. According to the evidence, there are only two possible sources of a special relationship out of which such a duty could arise in this case: the status of Whitlock as a student at the University, and the lease between the University and the fraternity of which Whitlock was a member. We first consider the adequacy of the student-university relationship as a possible basis for imposing a duty on the University to control or prohibit the use of the trampoline, and then examine the provisions of the lease for that same purpose.

### A.

■ The student-university relationship has been scrutinized in several jurisdictions, and it is generally agreed that a university is not an insurer of its students' safety. *See Bradshaw,* 612 F.2d at 138; *Beach,* 726 P.2d at 418–19; *Hegel v. Langsam,* 29 Ohio Misc. 147, 273 N.E.2d 351, 352 (Ohio Ct. of Common Pleas 1971). The relationship between a university and its students has experienced important change over the years. At one time, college administrators and faculties stood *in loco parentis* to their students, which created a special relationship "that imposed a duty on the college to exercise control over student conduct and, reciprocally, gave the students certain rights of protection by the college." *Bradshaw,* 612 F.2d at 139. However, in modern times there has evolved a gradual reapportionment of responsibilities from the universities to the students, and a corresponding departure

---

**4.** We recognize that under some fact situations the difference between negligent action and negligent failure to act can be simply a matter of characterization. *See* 3 Harper and James, § 18.6, at 712–17. However, the present case is one of pure failure to act, *i.e.,* where the University had it in its power to take reasonable action to eliminate the peril but had no part in creating it.

from the *in loco parentis* relationship. *Id.* at 139–40. Today, colleges and universities are regarded as educational institutions rather than custodial ones. *Beach,* 726 P.2d at 419 (contrasting colleges and universities with elementary and high schools). "Their purpose is to educate in a manner which will assist the graduate to perform well in the civic, community, family, and professional positions he or she may undertake in the future." *Id.* A university seeks to foster the maturation of its students. In a case involving injuries sustained by a student passenger in an automobile driven by a student who had become intoxicated by consuming alcoholic beverages in a college's residence hall and then had engaged in a speed contest, the California Court of Appeals stated:

> The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them responsibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest.

*Baldwin v. Zoradi,* 123 Cal.App.3d at 291, 176 Cal.Rptr. at 818. *Accord Beach,* 726 P.2d at 419.

In today's society, the college student is considered an adult capable of protecting his or her own interests; students today demand and receive increased autonomy and decreased regulation on and off campus. *See Bradshaw,* 612 F.2d at 139–40. The demise of the doctrine of *in loco parentis* in this context has been a direct result of changes that have occurred in society's perception of the most beneficial allocation of rights and responsibilities in the university-student relationship. *See id.;*

*Baldwin,* 123 Cal.App.3d at 291, 176 Cal. Rptr. at 818; *Beach,* 726 P.2d at 418–19. By imposing a duty on the University in this case, the University would be encouraged to exercise more control over private student recreational choices, thereby effectively taking away much of the responsibility recently recognized in students for making their own decisions with respect to private entertainment and personal safety. Such an allocation of responsibility would "produce a repressive and inhospitable environment, largely inconsistent with the objectives of a modern college education." *Beach,* 726 P.2d at 419.

The evidence demonstrates that only in limited instances has the University attempted to impose regulations or restraints on the private recreational pursuits of its students,[5] and the students have not looked to the University to assure the safety of their recreational choices. Nothing in the University's student handbook, which contains certain regulations concerning student conduct, reflects an effort by the University to control the risk-taking decisions of its students in their private recreation.[6] The testimony of the Assistant Dean of Student Life, whose office was in charge of the University's relationships with fraternities and sororities, reflects that, with the exceptions mentioned in footnote 5, the University did not attempt to regulate the recreational pursuits of members of the fraternities and sororities on campus. Indeed, fraternity and sorority self-governance with minimal supervision appears to have been fostered by the University. Aside from advising the Beta house on one occasion to put the trampoline up when not in use, there is no evidence that the University officials attempted to assert control over trampoline use by the fraternity members. We conclude from this record that the University's very limited actions concerning safety of student recreation did not

---

5. The University did prohibit skateboarding on campus because of injuries resulting from this activity and required those participating in fraternity boxing to have medical checkups. It also imposed some restrictions on student greased pole climbing contests.

6. The University had a safety council which monitored safety concerns on campus and acted in an advisory capacity to the University. The record does not reflect that the safety council addressed any matters of private recreational safety in addition to those mentioned in this opinion.

give Whitlock or the other members of campus fraternities or sororities any reason to depend upon the University for evaluation of the safety of trampoline use. *Cf. Restatement (Second) of Torts* § 314 A, comment b (1965) (dependence is a basis for recognition of a special relationship giving rise to a duty to aid or protect). Therefore, we conclude that the student-university relationship is not a special relationship of the type giving rise to a duty of the University to take reasonable measures to protect the members of fraternities and sororities from risks of engaging in extra-curricular trampoline jumping.

The plaintiff asserts, however, that we should recognize a duty of the University to take affirmative action to protect fraternity members because of the foreseeability of the injury, the extent of the risks involved in trampoline use, the seriousness of potential injuries, and the University's superior knowledge concerning these matters. The argument in essence is that a duty should spring from the University's natural interest in the welfare and safety of its students, its superior knowledge of the nature and degree of risk involved in trampoline use, and its knowledge of the use of trampolines on the University campus. The evidence amply supports a conclusion that trampoline use involves risks of serious injuries and that the potential for an injury such as that experienced by Whitlock was foreseeable. It shows further that prior injuries resulting from trampoline accidents had been reported to campus security and to the student clinic, and that University administrators were aware of the number and severity of trampoline injuries nationwide.

The record, however, also establishes through Whitlock's own testimony that he was aware of the risk of an accident and injury of the very nature that he experienced. There is no evidence that the fraternity or Whitlock looked to the University for evaluation of the appropriateness of the use of a trampoline, or had reason to do so, or that they were unable to assess in an adequate though general way the dangers presented by trampoline use. *Cf. Burchinal v. Gregory*, 41 Colo.App. 490, 586 P.2d 1012 (1978) (owners of trampoline had no duty to warn teenager of dangers of trampoline use or to instruct him on such use when teenager already understood and appreciated such danger and had more expertise in trampoline use than did the owner); *Restatement (Second) of Torts* § 314 A, comment b (1965) (dependence is a basis for recognition of a special relationship).

We conclude that the relationship between the University and Whitlock was not one of dependence with respect to the activities at issue here, and provides no basis for the recognition of a duty of the University to take measures for protection of Whitlock against the injury that he suffered.

## B.

■ We next examine the lease between the University and the fraternity to determine whether a special relationship between the University and Whitlock can be predicated on that document. The lease was executed in 1929, extends for a ninety-nine year term, and gives the fraternity the option to extend the term for another ninety-nine years. The premises are to be occupied and used by the fraternity "as a fraternity house, clubhouse, dormitory and boarding house, and generally for religious, educational, social and fraternal purposes." Such occupation is to be *"under control of the tenant."* (Emphasis added.) The annual rental at all times relevant to this case appears from the record to be one dollar. The University has the obligation to maintain the grounds and make necessary repairs to the building, and the fraternity is to bear the cost of such maintenance and repair. The University has the right to inspect the building. The fraternity agrees that the building will not be used for unlawful or immoral conduct and that the occupants of the building are to "observe the reasonable rules of conduct therein and thereabout imposed from time to time on students of the University of Denver generally by the lessor." The lease can be terminated by the University for nonpayment of rental or for violation of the covenant against improper conduct, or upon

notice after making provisions for a substitute facility. The lease is devoid of any other covenants limiting the activities of the fraternity or its members or giving the University the right to direct or control those activities. The University has promulgated no rules of conduct relating to private trampoline use. A lessor's reservation of rights to inspect the premises and make repairs is generally not sufficient control to give rise to liability of the lessor to the tenant or third parties for tort injuries. 3A G. Thompson, *The Modern Law of Real Property* § 1239, at 222 (1981).

The extent of control actually exerted by the University over the fraternity has been minimal. The University has supervised fire drills in the fraternity house and has required the fraternity to place a grid over one of its window wells because of an accident that had occurred. Also, a University representative once advised the Betas to take the trampoline down when not in use. Other than the suggestion made by the university official, which appears to have been only advisory as the fraternity failed to comply, the University's supervision has related primarily to fire protection, maintenance and repairs.

We conclude that the lease, and the University's actions pursuant to its rights under the lease, provide no basis of dependence by the fraternity members upon which a special relationship can be found to exist between the University and the fraternity members that would give rise to a duty upon the University to take affirmative action to assure that recreational equipment such as a trampoline is not used under unsafe conditions.

## IV.

Considering all of the factors presented, we are persuaded that under the facts of this case the University of Denver had no duty to Whitlock to eliminate the private use of trampolines on its campus or to supervise that use. There exists no special relationship between the parties that justifies placing a duty upon the University to protect Whitlock from the well-known dangers of using a trampoline. Here, a conclusion that a special relationship existed between Whitlock and the University sufficient to warrant the imposition of liability for nonfeasance would directly contravene the competing social policy of fostering an educational environment of student autonomy and independence.

We reverse the judgment of the court of appeals and return this case to that court with directions to remand it to the trial court for dismissal of Whitlock's complaint against the University.