The OBSERVATORY CORPORATION, a Colorado corporation, doing business as The Observatory, Petitioner,

v.

Raymond F. DALY, Respondent.

No. 88SC174.

Supreme Court of Colorado,
En Banc.

Sept. 18, 1989.
Rehearing Denied Oct. 23, 1989.

Tilly & Graves, P.C., John W. Grund, Katherine L. Vaggalis, Denver, for petitioner.

Michael G. Sabbeth, Denver, for respondent.

Chief Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Daly v. Observatory Corporation*, 759 P.2d 777 (Colo.App.1988), which reversed a directed verdict in favor of a tavern owner in a negligence case

arising out of injuries sustained by the plaintiff, a tavern patron, in the course of a vehicular assault caused by another patron in the tavern parking lot after the tavern had closed. The court of appeals, in reversing the judgment and remanding the case for a new trial, held that evidence of an earlier physical confrontation inside the tavern, in which the injured plaintiff's friend made a threatening remark while grabbing and shuffling the patron who ultimately caused the vehicular assault, was sufficient to establish the foreseeability element of legal duty, in that the tavern owner could reasonably have foreseen that the earlier confrontation inside the bar "could lead to further confrontation in the parking lot resulting in injury to one of its patrons." 759 P.2d at 779. We conclude that the evidence was not sufficient to establish that the tavern proprietor had either actual or constructive notice that the tavern patron causing the injury to the plaintiff constituted an unreasonable risk of harm to others legitimately on the tavern premises, and that, therefore, the tavern proprietor had no legal duty to protect the injured plaintiff from bodily harm under the particular circumstances of this case. We accordingly reverse the judgment of the court of appeals and order the reinstatement of the directed verdict in favor of the tavern proprietor.

## I.

In this case, the plaintiff, Raymond F. Daly, filed a tort action against the Observatory Corporation, which owned and operated a tavern, and a tavern customer, Russell Sheard, for damages resulting from an incident in which Sheard, in the early morning hours of January 28, 1984, while leaving the parking lot of the tavern, drove his automobile into the rear of a car occupied by the plaintiff, Daly, and operated by Daly's companion, Michael Fitzpatrick, and pushed the car across the parking lot and over an embankment, thereby causing injuries to Daly. Sheard settled with Daly prior to trial.[1] Daly's claims against the Observatory Corporation (hereinafter referred to as the Observatory), as pertinent here, were based on the Observatory's negligence in breaching its statutory and common-law duty not to serve alcoholic beverages to a visibly intoxicated person, see § 12–47–128(5)(a)(I), 5 C.R.S. (1985), and, independently of that claim, on the Observatory's negligent failure to protect Daly from the physical harm inflicted on him by Sheard while Daly was on the Observatory's premises. The Observatory asserted that the complaint failed to state a claim for relief and denied any negligence on its part.

The case was tried to a jury in July 1985, and the evidence established the following sequence of events. At approximately 7:30 p.m. on Friday, January 27, 1984, Daly arrived at the Observatory, which holds a tavern license to sell malt, vinous, and spirituous liquors for consumption by customers on its premises in Evergreen, Colorado. The tavern is small, with a bar and several bar stools, and twelve tables around the bar. There were three persons, a bartender and two waitresses, who were working at the tavern on the night in question. The Observatory provided entertainment by a band on weekend evenings.

After his arrival, Daly met several of his coworkers at the tavern, including Michael Fitzpatrick, and spent the evening drinking and socializing. Sheard entered the tavern at approximately 8:30 p.m. He had nothing to drink prior to his arrival and was not familiar to those working at the tavern. Sheard ordered a beer at the bar from the bartender, Peri Eringen, and paid for the drink in cash. Sheard, who described himself at trial as having an outgoing personality toward women in bars, struck up a "flirtatious" conversation with bartender Eringen. The conversation, however, resulted in a minor argument when Sheard asked the bartender for some paper on which to write and the bartender told him she was too busy to get him the paper. Sheard became upset and grabbed a billing tab from a waitress. Because the waitresses were required to account for each of their billing tabs, Eringen, who was some-

---

1. Pursuant to the settlement agreement, Sheard remained a party defendant during the trial.

what irritated over Sheard's behavior, told him not to write on the tab and to use a napkin for that purpose. Sheard returned the tab to the waitress and subsequently apologized to Eringen for his behavior. Eringen, who left the tavern at approximately 1:00 a.m., did not pay any particular attention to Sheard during the evening, but, because of this incident with the ticket, told the other waitresses to watch him.

Sheard sat at the bar until approximately 9:00 p.m., when he met Stacy Spielberger, and then both Sheard and Spielberger moved to a table. Spielberger spent about two hours with Sheard at the table and found him to be "overly friendly" and "flirtatious." During the two hours at the table, Sheard ordered a drink for Spielberger and himself, both of which were placed on his tab by a waitress. Spielberger's friend, Richard Roth, joined Spielberger and Sheard at the table around 10:30 p.m. Roth spoke with Sheard for approximately one-half hour before leaving the Observatory and found him to be an "extroverted, overfriendly" person. Neither Roth nor Spielberger was of the opinion that Sheard showed any signs of intoxication during their conversations with him. Sheard testified at trial that during the entire evening he had consumed about three or four beers and one or two coffees with brandy.

At approximately 1:00 a.m., Sheard asked his waitress, Cheryl Ann Pope, who was there working as both a waitress and a bartender, for his tab. Pope testified that she had been "keeping an eye" on Sheard "because he was being so friendly" and that, in the course of the evening, he had asked each of the three women working at the tavern—Pope, Eringen, and the other waitress—for a date. Pope calculated the tab at $17.00, of which approximately $8.50 was for drinks and the balance for food Sheard had ordered during the evening. Sheard gave his credit card to Pope in payment of the bill. Pope ran the card through a credit card machine and placed a pen, the credit card, and the charge slip at Sheard's table for his signature. When Pope returned for the signed charge slip, however, all three items were missing. Sheard said that he did not know what

happened to the items, and Pope again took his credit card and prepared a new charge slip for Sheard's signature. When Pope returned the second time, she discovered the charge slip burning in a candleholder on the table. Pope decided to make a third attempt at completing Sheard's charge transaction, but discovered that the credit card machine was missing. Pope then informed Sheard that she could not find the credit card machine and asked him if he would pay his bill in cash. Sheard agreed to pay the bill in cash, but Pope did not return his credit card to him.

Sheard was concerned about his credit card and went downstairs to a telephone in order to call the police to report that the credit card machine was missing and that his credit card had not been returned to him. Sheard was new to the area and, being unaware that the Jefferson County Sheriff's Office had jurisdiction over the area, attempted to call the "Evergreen Police." While on the telephone, Pope approached Sheard to inform him that it was closing time and that he had to leave the tavern. Pope overheard Sheard's telephone conversation and testified that, although he may have sounded "drunk" and "disoriented" because he was confused about the name of the local police department and he was unable to describe his present location, it was her opinion that he was not intoxicated. Sheard remained on the telephone and refused to leave despite Pope's requests that he use the telephone at a restaurant across the street.

Pope went upstairs to assist the other waitress in closing the tavern. The only remaining customers in the tavern, in addition to Sheard, were Daly and Daly's friend, Michael Fitzpatrick. Pope asked Daly and Fitzpatrick to remain in the tavern until Sheard left because, as Pope testified at trial, it was her experience that a customer who did not want to leave could give two women attempting to close the tavern a very difficult time. Daly and Fitzpatrick agreed to remain at the tavern until it was closed.

Fitzpatrick, on his own initiative, went down the stairs, grabbed Sheard's shoul-

ders, and made a threatening remark to him. Sheard continued his telephone conversation, and Fitzpatrick again grabbed Sheard's shoulders and shuffled him in the direction of the door. Pope and the plaintiff, Daly, had followed Fitzpatrick down the stairs and observed the confrontation between Fitzpatrick and Sheard. Daly conceded that no physical harm was caused to Sheard during the confrontation.

Sheard left the tavern and went to his Jeep in the tavern parking lot. Shortly thereafter, Daly and Fitzpatrick left the tavern and went to Fitzpatrick's Volkswagen in the tavern parking lot. Sheard observed them leaving the tavern and, becoming afraid that they would cause him bodily harm, decided to "immobilize" Fitzpatrick's Volkswagen by pushing it over an embankment into the snow. Sheard drove his Jeep into Fitzpatrick's Volkswagen and pushed Fitzpatrick's vehicle over a high embankment, causing serious injury to Daly. Sheard then drove to a telephone booth and called the police.[2]

At the conclusion of the evidence, the Observatory moved for a directed verdict on Daly's claim that the Observatory was negligent in failing to protect Daly from the physical harm caused to him by Sheard. The district court granted the motion, concluding that the evidence was insufficient as a matter of law to establish that the Observatory had some notice or knowledge that the harm caused by Sheard was reasonably foreseeable. The trial court submitted to the jury Daly's other theory of liability, which was based on the Observatory's breach of a statutory and common-law duty not to serve alcoholic beverages to a visibly intoxicated person. The jury returned verdicts in favor of the Observatory on this claim.

Daly thereafter appealed to the court of appeals, claiming that the trial court erred in granting the Observatory's motion for a directed verdict. In reversing the directed verdict and remanding the case for a new trial, the court of appeals held that the evidence of Pope's request to Fitzpatrick and Daly to stay until Sheard had left the tavern, along with the evidence of Pope's observation of the physical confrontation between Fitzpatrick and Sheard at the telephone, was sufficient to permit "a reasonable jury to determine that a reasonable bar owner would foresee a potential danger and act to prevent it" and that there thus was a question of fact as to whether the Observatory breached its duty to Daly. *Daly*, 759 P.2d at 778–79. We granted the Observatory's petition for certiorari to consider whether the evidence was sufficient to establish a legal duty on the part of the Observatory to protect Daly against the harm caused to him by Sheard, a tavern patron.

## II.

To recover on a claim of negligence, the plaintiff must establish the existence of a legal duty on the part of the defendant, breach of duty by the defendant, causation, and damages. *E.g., Perreira v. State of Colorado*, 768 P.2d 1198, 1208 (Colo.1989); *Leake v. Cain*, 720 P.2d 152, 155 (Colo. 1986). The existence and scope of a legal duty are questions of law for the court. *E.g., Perreira*, 768 P.2d at 1208; *Universi-*

---

2. Daly presented testimony from two law enforcement officers who responded to Sheard's telephone call. Both officers testified that, although they did not administer a breath or a blood alcohol test to Sheard, they were of the opinion that when they contacted him at approximately 2:25 a.m. he was intoxicated. In addition, Daly also presented opinion testimony from Dr. Daniel Tietelbaum, a toxicologist, to the effect that, based on his review of the officers' report of their observations of Sheard's physical characteristics, Sheard was very intoxicated when he left the tavern. While this opinion evidence of Sheard's intoxication was relevant to Daly's claim that the Observatory was negligent in serving Sheard intoxicating beverages when Sheard was in a visibly intoxicated condition, that claim was resolved adversely to Daly by the jury. The opinion evidence of the officers and the toxicologist did not bear on Daly's other theory of negligence—namely, that Sheard's conduct in the tavern, particularly his confrontation with Fitzpatrick, placed the tavern's employees on actual or constructive notice that he posed an unreasonable risk of bodily harm to others and that the tavern employees were under a legal duty to take precautionary measures to prevent any such harm from occurring.

ty of Denver v. Whitlock, 744 P.2d 54, 57 (Colo.1987); Taco Bell, Inc. v. Lannon, 744 P.2d 43, 46 (Colo.1987); Metropolitan Gas Repair Service, Inc. v. Kulik, 621 P.2d 313, 317 (Colo.1980). The court, in other words, determines as a question of law "the existence and scope of the duty—that is, whether the plaintiff's interest that has been infringed by the conduct of the defendant is entitled to legal protection." Metropolitan Gas Repair Service, 621 P.2d at 317.

■ A court's determination that the defendant did or did not owe a legal duty to the plaintiff is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." University of Denver, 744 P.2d at 57 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts § 53, at 358 (5th ed. 1984)). In making this determination the court must exercise a prudential judgment based on a weighing of many factors, including the foreseeability of harm from the failure of the defendant to take protective action, the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm, the practical consequences of placing such a burden on the defendant, and other relevant factors as disclosed by the particular circumstances of the case. E.g., Perreira, 768 P.2d at 1209; University of Denver, 744 P.2d at 57; Smith v. City and County of Denver, 726 P.2d 1125, 1127 (Colo.1986). If a court determines that the defendant owed a legal duty to the plaintiff under the particular circumstances of the case, then the issues of breach of duty and causation are generally matters for the jury's determination. E.g., Taco Bell, 744 P.2d at 50; Metropolitan Gas Repair Service, 621 P.2d at 317.

In the instant case, Daly's claim was predicated on dual theories of liability. The first theory was that the Observatory had a statutory and common-law duty not to serve alcoholic beverages to Sheard when he was visibly intoxicated and that the tavern breached its duty by serving Sheard while he was so intoxicated. We

have held that a tavern owner has both a statutory and common-law duty to exercise due care not to serve alcoholic beverages to a visibly intoxicated patron and that the tavern owner who breaches that duty will be liable in tort to third persons who are harmed as a result of the owner's breach of duty. Largo Corporation v. Crespin, 727 P.2d 1098, 1102-07 (Colo.1986). The trial court in this case instructed the jury on this theory of liability, and the jury returned a verdict in favor of the Observatory on Daly's claim. We are not concerned here with this aspect of the case.

It is Daly's second theory of liability which is the focus of our attention. Daly claimed that the Observatory knew or had reason to know that Sheard, by virtue of his conduct in the tavern on the evening in question and particularly his confrontation with Fitzpatrick, posed an unreasonable risk of harm to others, and that the Observatory breached its duty to protect its patrons from injury. In reversing the trial court's directed verdict for the Observatory on this latter theory of liability, the court of appeals ruled as a matter of law that the confrontation between Sheard and Fitzpatrick in the tavern created a legal duty on the part of the Observatory to protect Daly from any further confrontation in the parking lot that might result in injury and that a jury question was presented as to whether the Observatory breached its duty.

We have considered in prior decisions the existence and scope of a tavern proprietor's duty of care to a tavern patron. In Cubbage v. Leep, 137 Colo. 286, 323 P.2d 1109 (1958), the issue was whether a tavern proprietor could be held liable in negligence for injuries sustained by a tavern patron during a fight between the proprietor and another patron. In that case, Mr. and Mrs. Millhollin, after entering the tavern, seated themselves at the bar next to a soldier. The soldier paid for a drink, and Mrs. Cubbage, who was bartending and in charge of the tavern, placed the soldier's change on the bar. When Mr. Millhollin picked up the change belonging to the soldier, Mrs. Cubbage refused to serve the Millhollins any more drinks. Mrs. Millhollin, following a verbal argument with Mrs. Cubbage, went

behind the bar, grabbed Mrs. Cubbage by the hair, and pulled her to the floor. In the ensuing fight, the plaintiff-patron was injured. We held that the trial court should have directed a verdict for the tavern proprietor because there was no evidence to indicate that the proprietor, Mrs. Cubbage, knew or had reason to know that her argument with Mrs. Millhollin would erupt in violence. We noted that a tavern proprietor is not an insurer of the safety of patrons or guests, but rather owes them a legal duty to use reasonable care and diligence to protect them while lawfully on the premises and that reasonable care "is measured by what a person of ordinary prudence would or would not do under the same or similar circumstances," 137 Colo. at 289–90, 323 P.2d at 1110–11, and then stated:

> There is nothing in this record to indicate that Mrs. Cubbage acted in any other manner than a person of ordinary prudence would act under similar circumstances. For aught that appears in the record the Millhollins were sober and law abiding when they entered Cubs In, and when Mrs. Millhollin attacked Mrs. Cubbage the latter called for help and asked that the sheriff be called, but her plea was not heeded. There is nothing in the record to indicate that Mrs. Cubbage knew or had reason to believe or anticipate that her argument with Mrs. Millhollin would erupt in violence.

137 Colo. at 290, 323 P.2d at 1111. Moreover, we specifically rejected the argument that Mrs. Cubbage had notice of the Millhollins' violent propensities by reason of Mr. Millhollin's fight with a soldier in the tavern six months previously over a remark made by the soldier to Mrs. Millhollin. We stated in that regard as follows:

> The Millhollins had been in the Cubbage Tavern many times following this incident and no disturbance or boisterous conduct had been indulged by them during this six months period. It is conceded that the operator of a restaurant which dispenses intoxicating liquors is not an insurer of the safety of its guests, but is liable only for negligence.

137 Colo. at 290, 323 P.2d at 1111.

In *Vigil v. Pine*, 176 Colo. 384, 490 P.2d 934 (1971), we again considered a tavern proprietor's legal duty to a tavern patron under the following circumstances. Fred Vigil, a tavern patron, died as a result of a brutal beating inflicted upon him in the tavern by another patron, Ernest Pine, Jr. After Vigil entered the tavern and exchanged words with Pine, Pine left his bar stool, knocked Vigil down, and repeatedly beat Vigil's head against the cement floor of the bar. The evidence at trial showed that Pine had at least three prior altercations with tavern patrons, one of which resulted in his physically striking the other patron, and that the tavern proprietor witnessed these prior incidents. In addition, the evidence showed that the tavern proprietor had the opportunity to physically intervene and protect Vigil from the fatal beating, but refused to do so. We reversed the judgment of the court of appeals, which had rejected the jury verdict in favor of the plaintiff. In ordering the jury verdict reinstated, we emphasized that the plaintiff presented testimony "which not only indicated that [the tavern proprietor] knew of Pine's violent tendencies, but also that [the tavern proprietor] had sufficient time and opportunity to physically intervene to protect Vigil." 176 Colo. at 388, 490 P.2d at 936.[3]

◼ Our decisions in *Cubbage* and *Vigil* clearly indicate that the foreseeability of harm plays a prominent role in resolving the tavern proprietor's legal duty of care to patrons and other persons legitimately on the tavern premises. Under *Cubbage* and *Vigil*, a plaintiff, in establishing foresee-

---

3. We also considered a tavern proprietor's duty to a patron in *Schneider v. Pinnt*, 173 Colo. 232, 476 P.2d 1004 (1970), under circumstances which involved a severe beating of the plaintiff-patron by two other patrons in the parking lot of the tavern. Although the tavern proprietor was present in the parking lot when the beating occurred, and was requested by the plaintiff to stop the fight and to call the police, the tavern proprietor refused to intervene. We upheld a jury verdict for the plaintiff-patron on the basis of the proprietor's negligence in failing to reasonably protect the patron while lawfully upon the tavern premises.

ability, is not required to prove that a tavern proprietor had prior notice of the specific time and manner in which a tavern patron would engage in harmful conduct, but does bear the burden of proving that the tavern proprietor had some notice, either actual or constructive, that a tavern patron constituted an unreasonable risk of harm to persons legitimately on the tavern premises.[4]

■ While foreseeability of harm is a prominent element in determining a tavern proprietor's legal duty to patrons and other persons legitimately on the tavern premises, it is not the exclusive element. Our recent decisions make clear that a court must also consider, in addition to the foreseeability of harm, the social utility of the proprietor's conduct, the magnitude of the burden of guarding against the injury, the consequences of placing that burden upon the defendant, and any other relevant factors implicated by the facts of the case. *E.g., Perreira*, 768 P.2d at 1209; *Taco Bell*, 744 P.2d at 46; *Smith*, 726 P.2d at 1127. In *Taco Bell*, 744 P.2d 43, for example, we considered whether the proprietor of a fast food restaurant had a legal duty to take reasonable security measures to protect customers from the consequences of a criminal act on the part of an unknown third person. In our analysis we drew upon section 344 of the Restatement (Second) of Torts (1965), which states:

A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon

the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to

(a) discover that such acts are being done or are likely to be done, or

(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it.

We then quoted with approval comment f to section 344, which states that "[s]ince the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur." Because the plaintiff in *Taco Bell* had been injured during a robbery at the restaurant located in a high crime area, and because the restaurant had been subjected to ten armed robberies during the preceding three years, we determined that the risk of injury to the plaintiff was foreseeable. 744 P.2d at 49. We went on to conclude in *Taco Bell* that the other elements of the duty question—the burden of guarding against the harm and the practical consequences of placing such burden on the defendant—militated in favor of imposing a legal duty on the restaurant "to take reasonable measures to protect its customers from the consequences of criminal acts on the part of unknown third persons." *Id.* at 50. Although the facts of *Taco Bell* did not involve a tavern proprietor, we nonetheless believe that the principles enunciat-

---

4. Cases from other jurisdictions also support the view that prior notice of a patron's unreasonable risk of harm to others is essential to establish the foreseeability element of legal duty. *See, e.g., McFarlin v. Hall,* 127 Ariz. 220, 619 P.2d 729 (1980) (where evidence showed that tavern owners were aware of patron's propensity for violence, tavern owners had duty to take precautions to prevent violence to customers while patron remained intoxicated on the premises); *Heathcoate v. Bisig,* 474 S.W.2d 102 (Ky. 1971) (jury verdict upheld where evidence showed that patron-assailant knocked plaintiff off bar stool ten minutes before inflicting severe beating on plaintiff, since reasonably prudent tavern keeper would have anticipated further violence after first altercation and would have taken precautionary action); *Filas v. Daher,* 300

Minn. 137, 218 N.W.2d 467 (1974) (court affirmed judgment for tavern proprietor notwithstanding jury verdict for plaintiff-patron, since no possible inflammatory conduct existed to forewarn proprietor of assailant's unusual or abnormal conduct resulting in injuries to plaintiff); *Yarborough v. Erway,* 705 S.W.2d 198 (Tex.App.1985) (court reversed jury verdict because of insufficient evidence to place tavern proprietor's employees on notice or to alert them of dangerous or threatening situation between two patrons of tavern); *Moore v. Mayfair Tavern, Inc.,* 75 Wash.2d 401, 451 P.2d 669 (1969) (court affirmed jury verdict in favor of bar owner where, notwithstanding patron-assailant's noisy conduct and profane language, no evidence indicating patron would shoot another patron).

ed in that case, as well as our prior decisions specifically addressing the legal duty of a tavern proprietor to tavern patrons, provide the framework for resolving the duty issue under the particular circumstances of this case.

### III.

█ It was incumbent upon Daly to establish a legal duty on the part of the Observatory to protect him from the bodily harm caused to him by the act of Sheard, a tavern patron. The foreseeability element of legal duty required Daly to establish that the employees of the Observatory had some notice, either actual or constructive, that Sheard posed an unreasonable risk of harm to Daly or other persons legitimately on the tavern premises. Our review of the record satisfies us that the foreseeability element of legal duty was not satisfied in this case.

The employees of the Observatory had no familiarity with Sheard prior to the evening in question, and Sheard's conduct, while somewhat bothersome to the bartender and waitress, was not such as to put the employees on notice that he was prone to engage in physically assaultive conduct toward anyone or was inclined to take retaliatory action against Fitzpatrick or Daly upon their leaving the tavern. Sheard was neither physically nor verbally aggressive toward anyone at the tavern. He apologized to the bartender when the bartender displayed her displeasure at his attempt to take a waitress' billing tab and write on it, and when a controversy later arose between Sheard and the waitress over his credit card, he manifested no physically aggressive tendencies whatsoever. Although the waitress, Cheryl Ann Pope, requested Fitzpatrick and Daly to remain at the tavern until Sheard had left, she did so only to avert any possible difficulties with Sheard in the event no other men were in the tavern at closing. There is no evidence that Pope asked Fitzpatrick to physically confront Sheard, nor did she have any expectation that Fitzpatrick would do so. To be sure, Pope did witness a brief and relatively uneventful physical confrontation between Fitzpatrick and Sheard, but Sheard was a passive party to the confrontation and neither said nor did anything to put Pope on notice that he would retaliate against Fitzpatrick or Daly upon leaving the tavern.

█ While the foreseeability element of legal duty does not require a tavern proprietor to foresee the specific type of harm which a tavern patron will perpetrate against another or the manner in which that harm will likely be caused, it does require that the proprietor have actual or constructive notice that the patron poses an unreasonable risk of physical harm to other persons legitimately on the premises. *See generally Vigil*, 176 Colo. 384, 490 P.2d 934; *Cubbage*, 137 Colo. 286, 323 P.2d 1109. Only then, when the tavern proprietor has such notice, is the proprietor under a duty to exercise reasonable measures to protect others legitimately on the premises from harm. *See* Restatement (Second) of Torts § 344 comment f (1965). There is no evidence in this case of any such notice on the part of the Observatory that Sheard constituted an unreasonable risk of physical harm to Daly, Fitzpatrick, or anyone else at the tavern.

There also are other factors, in addition to foreseeability, to consider in the duty analysis. While there is not such a significant degree of social utility in operating a tavern as to tilt the balance in favor of negating any legal duty to protect persons legitimately on the tavern premises from the harmful conduct of a tavern patron, we nonetheless must be mindful of the magnitude of the burden that would be implicated by imposing a legal duty to protect Daly from the physical harm perpetrated by Sheard under the circumstances of this case. To impose such a duty would be tantamount to requiring a tavern employee to divine future violence on the part of a tavern patron notwithstanding the absence of any objective evidence indicating that the patron constituted an unreasonable risk to the safety of others. The practical consequences of such a rule would be to render the tavern proprietor a virtual insurer of the safety of all persons legitimately on its premises. We decline to adopt such a

rule. We accordingly conclude that the Observatory had no legal duty to protect Daly from the physical harm perpetrated against him by Sheard, a tavern patron, under the circumstances of this case.

The judgment of the court of appeals is reversed and the case is remanded to that court with directions to return the case to the district court for reinstatement of the directed verdict entered in favor of the Observatory.

ERICKSON, J., specially concurs.

Justice ERICKSON specially concurring:

Although I agree with the result reached by the majority, I write separately to set out what I perceive to be the proper analysis to resolve the issue of the duty of a tavern owner to its patrons.

As the trial court held, tavern owners have a duty to exercise reasonable care to protect patrons from foreseeable injury. *Cubbage v. Leep,* 137 Colo. 286, 289, 323 P.2d 1109, 1110–11 (1958). *See generally* Annotation, *Tavernkeeper's Liability to Patron for Third Person's Assault,* 43 A.L.R.4th 281, 288–89 (1986 & Supp.1988). Once a duty is found to exist, its scope must be delineated. Both the existence and scope of a duty are questions of law for the court. *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo.1980).

The primary factor in determining the scope of a duty is whether a particular harm is reasonably foreseeable. *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987). Foreseeability may be either general or specific. *See* Restatement (Second) of Torts § 344 comm. f (1965). In *Taco Bell* the danger was general. It arose, not because of any particular or specific threat, but from the experience of ten armed robberies on the premises within three years.

Unlike *Taco Bell,* this case involves a specific threat. The evidence did not establish a general duty to protect patrons arising from past experience with criminal activity. Any duty to protect against harm arose in the present case, if it did at all,

from the activities of the defendant Sheard on the premises the night plaintiff's injuries occurred. Nothing in the record gives rise to the inference that a reasonable person would have foreseen that Sheard would become aggressive and harm the plaintiff, or that anything the defendant's employees could have done would have prevented that harm. *See Yarborough v. Erway,* 705 S.W.2d 198 (Tex.Ct.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.) (jury's finding that tavern owner was negligent not supported by the evidence, where there was no evidence of probative value that employees were on notice that dangerous situation existed, or that employees had time to act even if trouble had been foreseen).

The confrontation between Fitzpatrick and Sheard did not take place at the request of any of defendant's employees, but was entirely Fitzpatrick's idea. *See, e.g., Lindsay v. Hartog,* 76 N.M. 122, 412 P.2d 552 (1966) (bar owners not liable where plaintiff, asked to accompany owners to table where patron was sitting, took it upon himself to eject the patron, and was injured when the patron struck him).

Once it is concluded that there was no duty to protect against Sheard's unforeseeable behavior, the trial court's directed verdict in favor of the defendant should be upheld. A discussion of policy considerations beyond foreseeability, which might be relevant to determining the scope of a duty in response to *general* threats, is unnecessary, where the threat involves a specific patron whose conduct becomes unexpectedly aggressive.

Accordingly, I specially concur in the result reached by the majority.